Filed 4/5/17  Certified for Partial Pub. 4/18/17 (order attached)

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E067122 |
| Plaintiff and Respondent, | (Super.Ct.No. J259403) |
| v. | O P I N I O N |
| J.K. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed in part and reversed in part.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant J.K.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant J.S.

1

Jean-Rene Basle, County Counsel, and Adam E. Ebright, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court terminated defendants and appellants, J.K.'s (Mother) and J.S.'s (Father; collectively Parents), parental rights as to J.S. (Minor) (born in June 2014). On appeal, Mother contends the appeal must be construed to include the order denying her Welfare and Institutions Code section 388[1] petition, the court erred by denying her an evidentiary hearing on her section 388 petition, the court violated her due process rights by preventing her from testifying regarding Minor's relationship with his sibling, and the court erred by finding the beneficial parental relationship exception to termination of parental rights inapplicable. Father joins Mother's arguments insofar as a resolution in her favor would benefit him. We reverse and remand the matter for a limited hearing on the issue of the sibling relationship exception.

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

On June 18, 2014, Merced County Human Services Agency (the Merced Department) received a referral alleging Minor tested positive for amphetamines at birth; Mother tested positive for amphetamines a month earlier; and Father tested positive for methamphetamines on June 19, 2014. Relatives reported Parents had drug issues; their

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] By order dated November 3, 2016, we incorporated the record in Parents' previous appellate case, case No. E065642.

drug of choice was methamphetamines. Prior to the instant incidents, Parents had agreed to participate in voluntary family maintenance services (VFMS) to address issues of homelessness and substance abuse.

On July 5, 2014, an officer responded to Parents' residence on a report of domestic violence between the two the day before; Mother reportedly grabbed Father by the arm while attempting to take Minor from Father as he walked down the stairs. A relative of Father shoved Mother into the wall; Father almost dropped Minor, but a relative caught Minor. The officer determined that Mother was the aggressor.

Later that day, the officer returned after a second incident. Witnesses heard screaming inside the house which sounded like a physical struggle between Parents. Mother jumped onto Father who was lying on a bed. The officer observed Father had sustained scratches to his neck. Minor was in close proximity during the fight. The officer determined that Mother was possibly the aggressor in the second incident as well. However, Father admitted "smacking" Mother four months before Minor was born. Mother has an extensive history of domestic violence involving Father and another man, including at least four reported incidents in 2011, 2013, and 2014.

Mother had an extensive prior history with four county departments, including 21 previous referrals.[3] The previous history included substantiated allegations of neglect in

---

[3] At the contested detention hearing, the social worker, apparently erroneously, testified that the history included *31* previous referrals.

2011 and 2014, substance abuse issues, and homelessness. Mother had previously received VFMS in 2007, 2011, and 2014.

The Merced Department filed a juvenile dependency petition alleging domestic violence incidents and substance abuse issues. Father testified at the contested detention hearing on July 10, 2014 that he last used methamphetamine about a week prior to Minor's birth. He had used methamphetamine around 30 times in 2014. Father had used methamphetamine on and off since 2007. He hit Mother on accident and denied that she had grabbed him; Minor did not fall; and the paternal aunt (PA) had grabbed him. Father's sister-in-law and the PA shoved Mother. Father asserted his relatives were the problem.

The social worker testified Mother informed her the domestic violence began during her third trimester. The court detained Minor.

In the jurisdiction report filed on August 6, 2014, Mother disputed the instant domestic violence incidents, although she admitted domestic violence in a previous relationship. Mother reported that when she lost custody of her other children a few years earlier, she lost everything; she then began selling and using methamphetamine. Mother said she stopped using when she found out she was pregnant; she opined her current positive test was due to her use of cold medication.

Mother tested negative for drugs on June 17, 2014; however, she tested positive for amphetamines and methamphetamines on July 8, 2014 and she tested positive for methamphetamines again on July 24, 2014. Mother said the positive tests were from

4

being in the same room with other people who were smoking methamphetamine. Father tested negative on July 25, 2014.

In the disposition report filed on August 22, 2014, the social worker recommended the juvenile court offer Parents reunification services. Mother denied any recent use of methamphetamine, as did Father. Mother had been diagnosed with breast cancer two years earlier, but did not seek timely treatment due to her lack of insurance; her prognosis was poor. Mother reported she was dying. The social worker observed: "The [P]arents love their child as witnessed during supervised visits." Parents visited no less than two hours weekly, showed Minor affection, expressed sadness when the visits were over, and bonded with Minor during each visit.

At the jurisdiction and disposition hearing held on September 11, 2014, the juvenile court adopted the findings in the Merced Department's report, sustained the allegations, removed Minor, placed Minor with the maternal grandmother (MGM), and ordered reunification services for Parents. On December 11, 2014, the court transferred the matter to San Bernardino County.

In the six-month review report filed on March 9, 2015, the social worker recommended the court return Minor to Parents' custody.[4] Mother was in treatment for stage four breast cancer, which included both chemotherapy and radiation; she had a prognosis of four years left to live. Parents were attending couple's counseling, were in a

---

[4] The proceedings were still occurring in Merced County. For no apparent reason, the court's transfer order had not been implemented.

substance abuse treatment program, and had urine tested negative for drugs; Father also completed a negative hair follicle test.

Initial visitation had been set at one-hour weekly, supervised. Visitation was later expanded to three hours weekly and then to all day and overnight visits. MGM became incapable of caring for Minor any longer and Minor was returned to Parents' custody on March 3, 2015. At the hearing on March 11, 2015, the court formally returned Minor to Parents' custody under VFMS. The court transferred the matter to San Bernardino County. San Bernardino County accepted the transfer on April 2, 2015.

In the status review report filed on September 8, 2015, the social worker from plaintiff and respondent, San Bernardino County Children and Family Services (CFS), recommended Minor remain with Parents, but with continued dependency jurisdiction. Parents were participating in monthly couple's therapy, though their counselor described their recent attendance as "sporadic." Parents were also participating in a 26-week outpatient recovery program; the program leader described Father as doing "a great job" and that he was benefiting from the program. However, Mother did not come as often as Father.

On June 10 and 25, 2015, Mother tested negative for controlled substances; however, on August 20, 2015, she tested positive for amphetamines. Father tested negative on June 29 and August 20, 2015. On June 29, 2015, Father reported that Mother

was beating him. Mother reported that Father had attacked and choked her. Father reported on September 3, 2015 that Parents were living in Merced County again.[5]

On September 16, 2015, Minor filed a section 388 petition requesting removal from Parents' custody. Minor's counsel noted that Parents had engaged in several incidents of domestic violence in Minor's presence. Minor attached evidence consisting of four police dispatch reports reflecting calls to Parents' residences between February 4 and June 29, 2015; the report dated April 27, 2015 reflected that Father reported Mother beat him; the report dated June 29, 2015 reflected Father hit Mother in the face. Minor's counsel asserted it would be in Minor's best interest not to be exposed to continued incidents of domestic violence.

On September 18, 2015, CFS filed a response recommending the court deny the petition. Mother had participated in a second, confirmation drug test on August 20, 2015, which came back with a negative result. Parents alleged they were working out their problems; their therapist reported they were following through with counseling. There were no reported incidents of domestic violence since June 2015. The MGM reported Parents were using drugs again. Parents tested negative on September 11, 2015.

On September 22, 2015, the juvenile court denied Minor's section 388 petition noting that Parents were planning on moving into separate residences. The court ordered

_____

[5]  Parents later reported that they were actually still living in San Bernardino County, but planned to move back to Merced County.

7

that custody of Minor remain with Parents with VFMS to include a domestic violence program.

In a detention report dated February 22, 2016, the social worker noted that Minor had been detained on February 18, 2016. Mother reported that Father was driving her to the hospital for treatment when she told him she was leaving him for another man; Father slapped her in the face. Father denied the incident. However, Father was arrested thereafter. The paternal grandfather (PGF) informed officers that Parents were "mutually combative" and that there was an incident where Mother accidently hit Minor while being carried by Father when attempting to hit Father.[6] The PGF additionally reported another time Father came into the house with a bloody nose after being hit by Mother. The PGF noted Minor was often left in the crib for hours with soiled diapers while Father used methamphetamine.

On February 22, 2016, CFS filed a supplemental juvenile dependency petition alleging substance abuse and domestic violence problems. On February 23, 2016, the juvenile court again detained Minor.

In the supplemental jurisdiction and disposition report filed on March 15, 2016, the social worker recommended that the court find the allegations true, sustain the supplemental petition, remove Minor, and offer Parents reunification services. Mother

---

[6] It is unclear from the record whether the incident of which the PGF was speaking was one of the initiating incidents of the dependency proceedings or a more recent similar incident.

recounted the domestic violence incident in the car. The PA reported she had witnessed Mother beat Father, punching him in the face while he was holding Minor. The police had been dispatched on December 25, 2012, when Mother reported that Father was "flipping out" after coming down off something.[7] Mother reported Father was using all his money on drugs. The PA showed the social worker a text from Father which read: "I got some drugs . . . ."

At a hearing on March 15, 2016, counsel for CFS noted that, based on the original petition, Parents were out of statutory time for reunification services and CFS had to recommend termination of reunification services. In an information to the court filed on March 24, 2016, the social worker reported that Minor "pulls back" from Mother and has no separation anxiety at the end of visits.

On March 24, 2016, the juvenile court found the allegations in the supplemental petition true, sustained the petition, removed Minor from Parents' custody, terminated Parents' reunification services, and set the section 366.26 hearing. Parents filed notices of intent to file petitions for extraordinary writs. This court dismissed the petitions for Parents' failure to timely file the writ petitions.

On September 14, 2016, Mother filed a section 388 petition requesting return of Minor with VFMS or reunification services. Mother alleged as changed circumstances

---

[7] It is unclear from the record whether Father was merely visiting Mother's residence, Parents were living together again, or Parents had simply never moved into separate residences.

that she "has engaged in services and completed programs in Merced County. Mother has undergone treatment for brain cancer that has stabilized her behavior and ability to function."[8] Mother alleged her services included safety planning, case management, individual counseling, and group counseling. She had completed a 14-week domestic violence support group. She attached an undated letter noting she had been attending a "Celebrate Recovery study group for the last [four] month[s]." Mother alleged the requested change was in Minor's best interest because Mother had been Minor's primary caregiver, until removal, since Minor's birth, had successfully reunified with Minor prior to the second removal, and had consistently engaged in positive visitation. The court summarily denied the petition on September 14, 2016, noting the request did not state new evidence or a change of circumstances and the proposed change did not promote the best interest of Minor.

In the section 366.26 report filed on September 16, 2016, the social worker recommended that the court terminate Parents' parental rights. Minor had been placed with the paternal grandmother (PGM) on June 24, 2016. Parents had been visiting consistently, two hours weekly; however, due to interfamily conflicts, the location of visits had changed from the PGM's house to a public location to ensure they remained appropriate: "While these visits have been consistent, they have not been without minor incidents in which both [P]arents and caregiver accuse each other of being disrespectful

_____

[8] It is unclear whether Mother meant "breast" cancer or had been diagnosed with another form of cancer.

10

and rude to one another (cussing, cancelling without notification, not respecting each other's personal preferences regarding the nature of the visits)."

Minor referred to the PGM as "'mom.'" The social worker noted a clear attachment between Minor and the PGM: The PGM "continues to work on building a strong and secure attachment with [Minor] by meeting his needs and providing him with structure, love, and nurturing." The PGM had known Minor since birth. The PGM reported "'[w]e are attached and very close, he calls me "mom."'" She wished to adopt Minor because "'[h]e is my grandson and he deserves to have a good life; he needs to be safe and in a safe, loving environment, and I feel I can give him what he needs.'"

In an information to the court filed on October 26, 2016, the social worker supervised a two-hour visit with Parents on October 11, 2016. Parents brought toys; Minor "was excited to see the toys, but did not have much reaction to seeing" Parents. Father was affectionate with and played with Minor. Mother "did not engage with [Minor] as much. Mother's interactions with [Minor] were not affectionate and . . . did not [reveal] a strong attachment between them. [Minor] did not go to [Mother] for comfort or to meet his needs."

In another information to the court filed on the same date, the social worker noted that poor and contentious communication between the family members had contributed to visits being cancelled. Parents cancelled a visit scheduled for September 21, 2016 because Parents said it was raining. The PGM said it was not raining. A visit scheduled for September 28, 2016 was terminated as the location for the visit had been changed and

Father said he did not know about the change. A visit scheduled for October 5, 2016 had been cancelled as the PGM reported Father became belligerent with her and got on top of her car in an attempt to prevent her from leaving.

At the section 366.26 hearing on October 26, 2016, Father testified he had a really close bond with Minor, that he loves Minor, that Minor "lights up" when he sees Father, and that it would be detrimental to Minor if Father's parental rights were terminated. Mother testified she has a parent-child relationship with Minor, that Minor likes to be physically close to her, that Minor calls her "[m]om," and that she has a significant bond with him. Mother testified she visited with Minor every week. The court found Minor adoptable, found no beneficial relationship exception applicable, and terminated Parents' parental rights.

## II. DISCUSSION

### A. *Mother's Section 388 Petition*[9]

Mother contends the court erred by denying her an evidentiary hearing on her section 388 petition. We disagree.

"To prevail on a section 388 petition, the moving party must establish that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best interests of the child. [Citation.]" (*In re J.T.* (2014) 228 Cal.App.4th 953, 965.) "Under section 388, a party 'need only make a prima facie showing to trigger the right to proceed by way of a full hearing.' [Citation.] The prima facie showing is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition. [Citation.] In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. [Citation.] The petition must be liberally construed in favor of its sufficiency. [Citations.]" (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.)

---

[9] Mother contends her appeal from the order terminating her parental rights should encompass the order denying her section 388 petition, even though she did not specify that order in her appeal, because that order was within 60 days of her filing of the notice of appeal. CFS, without conceding the issue, notes that regardless of whether this court chooses to liberally construe the notice of appeal as requested by Mother, the court did not err in denying her petition. We note that other courts have so construed the notice of appeal as requested by Mother and we will do so here. (*In re Madison W.* (2006) 141 Cal.App.4th 1447, 1451 [a parent's notice of appeal from an order terminating parental rights is liberally construed to encompass the denial of the parent's § 388 petition, provided the denial occurred within the 60-day period prior to the filing of the notice of appeal]; accord, *In re Angelina E.* (2015) 233 Cal.App.4th 583, 585, fn. 2.)

13

"We review a summary denial of a hearing on a modification petition for abuse of discretion. [Citation.] Under this standard of review, we will not disturb the decision of the trial court unless the trial court exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. [Citation.]" (*In re A.S.* (2009) 180 Cal.App.4th 351, 358.) Chronic substance abuse is generally considered a serious problem and, therefore, is less likely to be satisfactorily ameliorated in the brief time between termination of services and the section 366.26 hearing. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform."]; *In re Amber M.* (2002) 103 Cal.App.4th 681, 686 [no abuse of discretion in denying § 388 petition where mother established only a 372-day period of abstinence]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 ["seven months of sobriety since . . . relapse . . . , while commendable, was nothing new."]; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 ["To support a section 388 petition, the change in circumstances must be substantial. [Citation.] [A parent's] recent sobriety reflects 'changing,' not changed, circumstances. [Citation.]"].)

Even if the juvenile court errs in failing to hold an evidentiary hearing on a section 388 petition, that error will be held harmless unless there is a reasonable probability that in the absence of the error a result more favorable to the petitioner would have been reached. (*In re J.P.*, *supra*, 229 Cal.App.4th at pp. 128-129 [harmless where juvenile court erroneously failed to hold a hearing on a § 388 petition]; *In re G.B.* (2014) 227

14

Cal.App.4th 1147, 1162 [erroneous denial of hearing on second § 388 petition harmless where hearing was granted on first petition and where petitioner failed to identify additional evidence she would present at hearing]; *In re Victoria C.* (2002) 100 Cal.App.4th 536, 544 [erroneous denial of hearing on § 388 petition harmless where juvenile court had considered evidence attached to petition in periodic review hearing].)

Here, one of the primary bases for jurisdiction in the instant case was the sustained allegations that Mother had an extensive history of substance abuse issues which placed Minor at risk of harm. Mother tested positive for amphetamines a month prior to Minor's birth. Relatives reported she had drug issues, particularly with methamphetamine. Mother had previous substantiated allegations regarding substance abuse issues. Mother reported that she began using and selling methamphetamine a few years earlier when she lost custody of her other children.

Nevertheless, while Mother participated in a 26-week outpatient recovery program, it was noted that she attended less frequently than did Father. Indeed, there is no indication in the record that Mother actually *completed* the program. In fact, Mother subsequently had two positive drug tests in July 2014, and one in August 2015.[10]

In Mother's petition dated September 14, 2016, with respect to substance abuse issues, Mother attached only an undated letter noting she had been attending a "Celebrate Recovery study group for the last [four] month[s]." The lack of a date on the letter, the

_____

[10] Although a confirmation test apparently conducted the same day came back as negative.

lack of specificity regarding the nature of the program, and, in particular, Mother's failure to even allege *any* period of sobriety, in and of itself, establish a lack of a prima facie case for a change in circumstances. Indeed, the last record of a drug test in which Mother participated was the September 11, 2015 test, more than a year earlier.

Moreover, the other primary basis for jurisdiction was Mother's engagement in domestic violence, not only as a victim, but also as an aggressor. The officer who investigated the two initiating incidents reported that Mother was the aggressor in the first incident and the possible aggressor in the second. Father reported that Mother beat him. The PGF reported that Parents were "mutually combative" and that Mother had hit Minor accidently in an attempt to hit Father while he was carrying Minor. The PA reported witnessing Mother beat Father, punching him in the face while he was holding Minor.

However, Mother's only basis for alleging a change of circumstances with respect to domestic violence was her completion of a 14-week domestic violence *support* group. At best, the rational inference of her attendance of a *support* group is that it was directed at *victims* rather than *perpetrators* of domestic violence. Mother never alleged she had participated in any program to address her issues with *initiating* domestic violence.

Finally, Mother's assertion that it would be in the best interest of Minor to return him to her care or offer her additional reunification services fails. The record reflects that Mother herself reported that she lost custody of all her previous children. Prior to the initiation of the proceedings in the instant case, Mother was already receiving VFMS.

16

Mother received 18 months of reunification and family maintenance services in the instant case; Mother was out of the statutory time for continued reunification services.

CFS had to remove Minor from Mother's custody twice in the instant case. Minor was out of Mother's custody at less than a month old in July 2014, until March 3, 2015, and then from February 18, 2016 to the date Mother filed her petition; thus, Minor had spent more than half his life outside Mother's custody.

Mother had not received unsupervised visitation since February 2016, eight months earlier. Mother testified she never missed any visitation, but this is belied by the social worker's report that Parents missed visitation on September 21, 2016. A foster parent reported that Minor pulled away from Mother and had no separation anxiety when visits ended. The social worker's report indicated that Minor did not have much reaction upon first seeing Mother during visitation, Mother did not engage with Minor much during visitation, her interactions with him were not affectionate, and there was not a strong attachment between the two. Thus, the court did not abuse its discretion in summarily denying Mother's petition.

Counterbalanced with information provided subsequent to the court's denial of Mother's petition regarding the relationship between Minor and the PGM renders any error in the denial of a hearing harmless. Minor referred to the PGM as "mom." The social worker observed a clear attachment between Minor and the PGM. The PGM "continues to work on building a strong and secure attachment with [Minor] by meeting his needs and providing him with structure, love, and nurturing." She had known Minor

since his birth. The PGM wanted to adopt Minor because "'[h]e is my grandson and he deserves to have a good life; he needs to be safe and in a safe, loving environment, and I feel I can give him what he needs.'" Thus, Mother failed to make a prima facie claim for a change of circumstances. Regardless, even if the court erred in declining to hold a hearing on the petition, any error was harmless because Mother's requested relief would not have been in Minor's best interest.

B. *Due Process*

Mother contends the court violated her due process rights by preventing her from testifying regarding Minor's relationship with his sibling; hence, effectively negating any evidentiary basis she might have had for arguing the sibling relationship exception to termination of parental rights. We agree.

While Mother's counsel examined Mother during the section 366.26 hearing, counsel asked if Mother had any other children. Mother responded that she did. Counsel asked if any were living with her. Mother responded that her middle, eight-year-old son lived with her. Counsel for CFS objected on the basis of relevance. The court observed: "I'm not sure why this is relevant . . . ." Mother's attorney argued: "Well, he does have a relationship, essentially, with the maternal family, including his full siblings. I feel that it gives a bigger picture of—a better picture of the relationship that he has, that it's just not simply with Mother, it's with the entire family." The court replied: "Except the only consideration that we have today is the relationship with the [M]other and the [F]ather.

18

So that is the relationship that is the one required to have the scrutiny for a [section] [366].26 [hearing]."

"Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citation.] Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption. [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 61.) Parents have the burden of establishing the applicability of the exception. (See *In re Megan S.* (2002) 104 Cal.App.4th 247, 252.)

In reviewing challenges to a trial court's decision as to the applicability of these exceptions, we will employ the substantial evidence or abuse of discretion standards of review depending on the nature of the challenge. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316.) We will apply the substantial evidence standard of review to evaluate the evidentiary showing with respect to factual issues, such as whether the child has a close and strong bond with a sibling (for the sibling relationship exception). (*Id.* at p. 1315; § 366.26, subd. (c)(1)(B)(i), (v).) However, a challenge to the trial court's determination of questions such as whether, given the existence of a sibling relationship,

there is a compelling reason for determining that termination of parental rights would be detrimental to the child "'is a quintessentially discretionary determination.'" (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.) We review such decisions for abuse of discretion. (*Ibid.*)

In the dependency context, both standards call for a high degree of appellate court deference. (*In re Scott B.*, *supra*, 188 Cal.App.4th at p. 469; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) "[T]he ultimate question is whether adoption would be detrimental to the adoptive child, not someone else." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 55.) "'The author of the legislation adding the sibling relationship exception anticipated that "use of the new exception 'will likely be rare,'" meaning "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption."' [Citations.]" (*In re D.O.* (2016) 247 Cal.App.4th 166, 174.) "In dependency proceedings, due process violations have been held subject to the harmless beyond a reasonable doubt standard of prejudice. [Citations.]" (*In re Justice P.* (2004) 123 Cal.App.4th 181, 193.)

"Of course a parent has a right to 'due process' at the hearing under section 366.26 which results in the actual termination of parental rights." (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 816.) "Due process is a flexible concept which depends upon the circumstances and a balancing of various factors. [Citation.] The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court. [Citations.]" (*Id.* at p. 817.) Juvenile courts typically allow parents to

20

testify regarding the relationship a minor may have with his siblings. (*In re I.R.* (2014) 226 Cal.App.4th 201, 207; *In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1317-1318.)

Here, contrary to the juvenile court's statement that only the relationship between Parents and Minor was at issue, Minor's relationship with his siblings was also at issue. This is because substantial interference with a strong relationship with any sibling is one of the specifically enumerated statutory exceptions to termination of parental rights.

Here, the juvenile court's prohibition against further questioning regarding Minor's bond with his sibling eliminated any evidentiary basis for Mother to argue the sibling relationship exception applied. Indeed, we can find no other evidence in the record to suggest Mother had custody of any of her other children and that they had any relationship with Minor. In fact, the evidence in the record suggests the contrary, that Mother no longer had custody of any of her other children.

Thus, if Mother testified that she had regained custody of one of her children this would have placed the sibling relationship exception at issue because Mother had also regained custody of Minor for nearly a year during the proceedings below. The error cannot be deemed harmless because we cannot say how long Minor and his sibling may have lived with one another, what the degree of their bond might have been, and what credibility the juvenile court would have given Mother's testimony on the issue. Therefore, the matter must be reversed and remanded for a hearing on the degree, if any, of any relationship between Minor and his siblings.

C. *The Beneficial Parental Bond Exception*

Mother contends the court erred in determining the beneficial parental bond exception to termination of parental rights was inapplicable. We disagree.

Once reunification services have been terminated and a child has been found adoptable, "adoption should be ordered unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) Under section 366.26, subdivision (c)(1)(B)(i), one such exception exists where "'[t]he parents . . . have maintained regular visitation and contact with the [child] and the [child] would benefit from continuing the relationship.'" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534.) A beneficial relationship is established if it "'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'" (*Ibid.*, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "The parent has the burden of proving that termination would be detrimental to the child . . . ." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1207.)

"'[T]he court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

"[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; accord, *In re Casey D*., *supra*, 70 Cal.App.4th at p. 51.) "We determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights . . . ." (*In re S.B.* (2008) 164 Cal.App.4th 289, 297-298.)

Here, early reports reflected that "[P]arents love their child as witnessed during supervised visits." Parents visited consistently, showed affection, expressed sadness when a visit was over, and bonded with Minor during each visit. Indeed, Parents moved from once weekly two-hour visits to three hours weekly to all day visits to overnight visits. Eventually, Minor was placed back in the custody of Parents.

However, the court later detained and removed Minor from Parents' custody a second time after several incidents of domestic violence took place in Minor's presence. Since the second detention in February 2016, eight months earlier, Mother had not received unsupervised visitation. Mother testified she never missed any visitation, but this is belied by the social worker's report that both Parents missed visitation on September 21, 2016, and possibly on other dates as well.

A foster parent reported that Minor pulled away from Mother and had no separation anxiety when visits ended. The social worker's report indicated that Minor did not have much reaction upon first seeing Mother, Mother did not engage with Minor much during visitation, her interactions with him were not affectionate, and there was not a strong attachment between the two. The Merced Department detained Minor before he was even a month old and he was out of Mother's custody until March 3, 2015, and then from February 18, 2016 to the date of the section 366.26 hearing; thus, Minor had spent more than half his life outside Mother's custody.

When considered in context with the information provided regarding the relationship between Minor and the PGM, there was no apparent detriment to Minor from terminating Mother's parental rights. Minor referred to the PGM as "mom." The social worker observed a clear attachment between Minor and the PGM. The PGM "continues to work on building a strong and secure attachment with [Minor] by meeting his needs and providing him with structure, love, and nurturing." She had known Minor since his birth. The PGM wanted to adopt Minor because "'[h]e is my grandson and he deserves to have a good life; he needs to be safe and in a safe, loving environment, and I feel I can give him what he needs.'" Thus, Mother failed to prove termination of her parental rights would be detrimental to Minor. Substantial evidence supports the court's order.

### III. DISPOSITION

The order terminating Parents' parental rights is reversed and the matter is remanded for a limited evidentiary hearing on the issue of the applicability of the sibling

24

relationship exception.  Parents shall be permitted, if they so desire, to testify regarding the quality of any relationship between Minor and any of his siblings.  The juvenile court shall then make a determination regarding whether the sibling relationship exception overrides the legislative preference for adoption.  In all other respects, the judgment is affirmed.

McKINSTER_____
J.


We concur:

HOLLENHORST_____
Acting P.J.

MILLER_____
J.

25

Filed 4/18/17

**CERTIFIED FOR PARTIAL PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


| | |
|---|---|
| In re J.S., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.K. et al.,<br><br>    Defendants and Appellants. | E067122<br><br>(Super.Ct.No. J259403)<br><br>ORDER GRANTING PUBLICATION |


THE COURT

A request having been made to this Court pursuant to California Rules of Court, rule 8.1120(a), for partial publication of a nonpublished opinion heretofore filed in the above entitled matter on April 5, 2017, and it appearing that the opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c),

1

IT IS ORDERED that said opinion be certified for partial publication, with the exception of section II.A. and C., pursuant to California Rules of Court, rules 8.1105(b), 8.1105(c)(4), and 8.1105(c)(6).

McKINSTER_____

J.

We concur:

HOLLENHORST_____

Acting P. J.

MILLER_____

J.