Filed 9/25/24 In re Emma A. CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re EMMA A. et al., Persons Coming Under the Juvenile Court Law. | B334544 |
| | (Los Angeles County Super. Ct. No. 21CCJP03705 D&E) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| ARTURO A. et al., | |
| Defendants and Appellants. | |

APPEAL from orders of the Superior Court of Los Angeles County, Daniel Zeke Zeidler, Judge. Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant Arturo A.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant Annel L.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

Arturo A. and Annel L. appeal from the juvenile court's orders terminating their parental rights to Emma A. and Ysabella A. under Welfare and Institutions Code section 366.26.[1] Arturo and Annel argue the court erred in terminating their parental rights because, according to Arturo and Annel, the court's orders would interfere with their children's sibling relationships and the court should have applied the sibling relationship exception to adoption (§ 366.26, subd. (c)(1)(B)(v)). Because the court did not err in ruling that exception did not apply, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Emma Tests Positive for Methamphetamine at Birth, and the Juvenile Court Removes Her and Ysabella from Annel and Arturo*

Annel has four children. Arturo is the father of Ysabella (now five years old) and Emma (now three years old). Jose L. is the father of Jesus L. (now 12 years old) and Victoria L. (now 10 years old), although Jesus and Victoria are not the direct subjects of this appeal. When Annel gave birth to Emma in

_____

[1]    Statutory references are to the Welfare and Institutions Code.

2

July 2021, she and Emma tested positive for methamphetamine. Annel admitted to hospital staff that she had used methamphetamine "for many years," but said that she stopped "days before" giving birth to Emma "to see if [she] could test negative for drugs." Annel told a social worker from the Los Angeles County Department of Children and Family Services that she had three other children who were living with relatives. Annel reported that she and Arturo were living in a car and that Arturo has schizophrenia and "hears voices and sees things that are not there."

Jose told the social worker that he and Annel separated four or five years ago because "there was ongoing conflict within the relationship." Jose said that he was "not surprised" Annel exposed her newborn baby to drugs during the pregnancy, that he "always suspected" Annel used drugs, and that he believed Annel left their children with relatives when she went out to use drugs. The Department could not locate Arturo and conducted a due diligence search for him. During most of the dependency case, the Department did not know where Arturo was.[2]

Further investigation by the Department revealed that Annel left the children at least three times without making a plan for their care, twice for two months and once for one month. Annel admitted to the social worker that she has left the children for "months at [a] time" because she "was binge smoking meth" and did not want to expose the children to "drug induced behaviors." Elizabeth C., a paternal aunt, stated that Arturo has

---

[2]     A Department investigator told the court at the detention hearing that he had not been able to find Arturo and that a family member reported that, when Arturo learned about the case, he said he wanted "nothing to do with the government."

3

used drugs "for most of his life," that Annel and Arturo had a history of domestic violence, and that Annel would leave the children for "weeks" to "get high."

In October 2021 the court sustained an amended petition under section 300, subdivisions (b) and (j), finding that Annel had a history of domestic violence with Jose and Arturo; that Annel's history of using, and current use of, drugs placed Emma at risk of physical harm and rendered Annel incapable of providing regular care for her children; that Annel left the children in the care of relatives without making a plan for their ongoing care and supervision, and Jose and Arturo failed to protect their children; and that Arturo's mental health problems and history of substance abuse rendered him incapable of providing regular care for his children. The court declared all four children dependent children of the juvenile court, removed Jesus and Victoria from Annel and placed them with Jose under the supervision of the Department, and removed Ysabella and Emma from Annel and Arturo and placed them under the care and supervision of the Department for suitable placement.

The Department placed Ysabella with Cleotilde R., the children's maternal grandmother, and maintained Emma's placement with Elizabeth, with whom Ysabella had been living since the court detained her shortly after her birth. The court ordered Annel to complete a substance abuse prevention program, parenting classes, and individual counseling and to submit to random on-demand testing.

B. *Annel Complies with Her Case Plan and Regains Custody of Ysabella and Emma*

Over the next 12 months Annel completed her court-ordered programs and largely tested clean, though she missed a few tests. The social worker reported Ysabella and Emma were thriving in the home of their respective caregivers, and the court maintained the girls' placements at the six-month review hearing. In the spring of 2022 Ysabella got very sick and was in the hospital for five weeks. Doctors diagnosed Ysabella with autoimmune encephalitis, and Annel assisted Cleotilde with caring for Ysabella, who required "a very strict regimen" of medications. The court placed Ysabella with Annel on the condition Annel and Ysabella both reside with Cleotilde.[3] In September 2022 Jose drove under the influence of alcohol (and with a suspended license) while he was on his way to pick up his children, hit a car, and attempted to flee the scene of the accident.

At the 12-month review hearing in October 2022, the court placed Jesus and Victoria with Cleotilde. The court also permitted Emma to have overnight visits with Annel at Cleotilde's home, where the other siblings were also staying. The court later allowed Emma to have an extended visit with Annel for two months.

In January 2023 the court found Annel had complied with her case plan, placed Emma with Annel, and maintained Ysabella's placement with Annel in Cleotilde's home. With respect to Jesus and Victoria, the court sustained allegations in

_____

[3]    We augment the record to include the juvenile court's July 14, 2022, January 11, 2023, and February 17, 2023 minute orders. (Cal. Rules of Court, rules 8.155(a)(1)(A), 8.410(b)(1).)

an amended petition that Jose drove under the influence of alcohol, removed Jesus and Victoria from Jose, and placed them with Annel under the supervision of the Department. The following month, the court terminated its jurisdiction over Ysabella and released her to Annel.

C.    *Annel Relapses and Loses Custody Again*

In June 2023 Annel left the children at Cleotilde's home without notifying anyone or instructing anyone how to care for the children, including how to administer Ysabella's medications. The following day, Ysabella suffered a seizure and required immediate medical attention, but Cleotilde did not know where Annel (who had taken the children's food stamps) was or how to reach her. Cleotilde believed Annel had run off with Arturo to use drugs.

The Department filed a supplemental petition under section 387 regarding Jesus, Victoria, and Emma and a new petition under section 300, subdivision (b), regarding Ysabella. The Department alleged, among other things, Annel endangered the children's physical health, safety, and well-being when she left them without making a plan for their ongoing care and supervision.[4] At the hearing on the petitions, no one knew where Annel and Arturo were. Counsel for the children informed the court that the children had not seen Annel for almost two weeks. The court detained all four children from Annel, placed Jesus and Victoria with Cleotilde, Ysabella with a foster parent, and Emma with Elizabeth and ordered twice monthly sibling visits.

---

[4]    The new petition under section 300, subdivision (b), also alleged Arturo had a history of substance abuse, which rendered him incapable of providing regular care for Ysabella.

The court later sustained the allegations in the petitions under sections 300, subdivision (b), and 387.  The court removed all four children from Annel and found (or repeated prior findings) that placing Emma or Ysabella with Arturo would pose a substantial danger and risk of detriment to them.  The court set a selection and implementation hearing for Emma and Ysabella under section 366.26.

In August 2023 Annel, on her own, filed a petition under section 388, asking the court to grant her six months of reunification services for Emma.  Annel claimed that she "made the choice of not having Arturo . . . in [her] life" and that she would "keep trying" to improve herself for her children.  The court denied the petition because Annel was "represented by counsel."  Four months later, counsel for Annel filed a petition under section 388, which the court also denied.

In September 2023 the Department placed Ysabella back in Cleotilde's home.  In November 2023 the court ordered the Department to arrange weekly sibling visits.  The social worker reported that, though the Department gave Annel a written visitation schedule, she sometimes did not show up or arrived late.  The social worker stated the sibling visits occurred once a week at Cleotilde's home.  The reports did not include any details of the sibling visits.

D.    *The Court Terminates Arturo's and Annel's Parental Rights*

In January 2024 the court placed Jesus and Victoria with Jose and ordered him to ensure visits for the children at Cleotilde's house.  The court stated Annel could participate in

7

conjoint counseling with the older children if she was in therapy and the therapists recommended it.

The court proceeded to the selection and implementation hearing for Ysabella and Emma. Counsel for Annel asked the court to order legal guardianship in lieu of adoption for the girls because "there would be a substantial interference with their sibling relationship with one another and with their older two siblings." Counsel for Annel claimed that, while Annel would continue to visit the two older children and Ysabella, visits with Emma would "likely disappear" given the "fraught" relationship between Annel and Elizabeth. Counsel for Annel pointed out that the Department did not provide a plan for the caregivers to facilitate sibling visitation. Counsel for Arturo joined Annel's request the court apply the sibling relationship exception to adoption. Counsel for the children argued against applying the sibling relationship exception and asked the court to terminate Annel's and Arturo's parental rights. The court commented that, because there was no information in the reports about the sibling relationships, there was not much "to support the sibling bond exception."

The court observed that the only period Emma lived with Annel was from October 2022 to June 2023 and that Emma had spent almost her entire life outside of the home of any of her siblings. The court acknowledged that Ysabella had "existing close and strong bonds" with Jesus and Victoria and that she shared "significant common experiences" with them. The court found, however, that it would not be detrimental to Ysabella or Emma if the sibling relationships ended as a result of the court terminating Annel's and Arturo's parental rights and that the benefit of the sibling relationships did not outweigh the

permanence of adoption. The court terminated Annel's and Arturo's parental rights and transferred the children's care, custody, and control to the Department for adoptive planning and placement.[5] Annel and Arturo timely appealed.

## DISCUSSION

A. *Applicable Law and Standard of Review*

"To guide the court in selecting the most suitable permanent arrangement" for children who cannot reunify with their parents, section 366.26 "lists plans in order of preference and provides a detailed procedure for choosing among them." (*In re Caden. C.* (2021) 11 Cal.5th 614, 630; see § 366.26, subd. (b).) "According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. [Citation.] If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, at pp. 630-631; see § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A); *In re Celine R.* (2003) 31 Cal.4th 45, 53 (*Celine R.*); *In re J.S.* (2017) 10 Cal.App.5th 1071, 1080.)

One of the exceptions to "the normal requirement of adoption" allows the juvenile court "to consider the sibling relationship in deciding whether a compelling reason exists to

---

[5]     The Department designated Cleotilde as Ysabella's adoptive parent and Elizabeth as Emma's adoptive parent.

9

choose something other than adoption." (*Celine R.*, *supra*, 31 Cal.4th at pp. 53, 54; see § 366.26, subd. (c)(1)(B)(v); *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 781 (*Elizabeth M.*); *In re J.S.*, *supra*, 10 Cal.App.5th at p. 1080.) "The purpose of the sibling exception is to preserve long-standing sibling relationships that serve as 'anchors for dependent children whose lives are in turmoil.'" (*Elizabeth M.*, at p. 781; see *In re Isaiah S.* (2016) 5 Cal.App.5th 428, 437.) The sibling relationship exception applies when the juvenile court concludes there would be "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v); see *Elizabeth M.*, at p. 781; *In re D.O.* (2016) 247 Cal.App.4th 166, 173.) "'To show a substantial interference with a sibling relationship the parent . . . must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child.'" (*Elizabeth M.*, at p. 781; see *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952.)

"'The court is specifically directed to consider the best interests of the adoptive child, not the siblings, and must ultimately determine whether adoption would be detrimental to the adoptive child, not the siblings.'" (*Celine R.*, *supra*, 31 Cal.4th at p. 54; see *In re D.O.*, *supra*, 247 Cal.App.4th at p. 174.) "The parent has the burden of proving the statutory

exception applies." (*Elizabeth M.*, *supra*, 19 Cal.App.5th at p. 781; see *In re J.S.*, *supra*, 10 Cal.App.5th at p. 1080.)

"We will apply the substantial evidence standard of review to evaluate the evidentiary showing with respect to factual issues, such as whether the child has a close and strong bond with a sibling . . . . [Citations.] However, a challenge to the trial court's determination of questions such as whether, given the existence of a sibling relationship, there is a compelling reason for determining that termination of parental rights would be detrimental to the child "'is a quintessentially discretionary determination.'"" (*In re J.S.*, *supra*, 10 Cal.App.5th at p. 1080; see *In re D.O.*, *supra*, 247 Cal.App.4th at p. 174.) Thus, when the juvenile court "concludes the benefit to the child derived from preserving the sibling relationship is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption, we review that determination for abuse of discretion." (*Elizabeth M.*, *supra*, 19 Cal.App.5th at p. 782; see *In re Caden C.*, *supra*, 11 Cal.5th at p. 640 [reviewing for abuse of discretion the juvenile court's determination "whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent"].) "In reviewing factual determinations for substantial evidence, a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.' [Citation.] The determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.'" (*Caden C.*, at p. 640.)

## B. *The Juvenile Court Did Not Abuse Its Discretion in Declining To Apply the Sibling Exception to Adoption*

### 1. *Emma*

Substantial evidence supported the juvenile court's implied finding Emma did not have a significant relationship with any of her siblings. As the court observed, in Emma's young life of two and a half years she spent only eight months in Annel's care while Jesus, Victoria, and Ysabella also lived with Annel in Cleotilde's home. Emma spent almost all of her life in Elizabeth's home, separate from her siblings. (See *Celine R.*, *supra*, 31 Cal.4th at p. 61 [where the children lived apart from their older sibling since they were very young, "the conclusion was virtually compelled that they had not been 'raised with [their sibling] in the same home' and had not 'shared significant common experiences or [had] existing close and strong bonds with [her]'"].) Emma did participate in the sibling visits the court ordered in June 2023. But Annel and Arturo, who had the burden to prove the sibling relationship exception applied (*Elizabeth M.*, *supra*, 19 Cal.App.5th at p. 781), did not present evidence that Emma engaged meaningfully with her siblings during these weekly to biweekly visits or that she was bonded, much less significantly bonded, to her siblings. (See *In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952 ["there was no evidence [the child], other than being sad, would suffer detriment if the [sibling] relationship ended"]; cf. *In re C.B.* (2010) 190 Cal.App.4th 102, 129 [where "both children testified to the importance of their relationship with their older sister," the court "recognized that they had been raised together for much of their lives and had shared common experiences"].)

The court also acted within its discretion in ruling any benefit to Emma from her sibling relationships did not outweigh the stability and permanence she would derive from adoption. As discussed, because Annel and Arturo did not show Emma's sibling relationships were significant, the court did not err in concluding any interference with those relationships as a result of the court terminating Annel's parental rights would not be detrimental to Emma. As Emma's primary caregiver for most of her life, Elizabeth had developed "a natural parent-child relationship" with Emma, and Emma thrived in her care. Given Emma's young age and the upheaval she had already experienced—living away from her parents and siblings since birth, returning to Annel's care after more than one year, and moving back to Elizabeth's home after Annel abandoned her—the stability Elizabeth would provide through adoption was particularly important. (See *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014 ["application of [the sibling relationship] exception will be rare, particularly when the proceedings concern young children whose needs for a competent, caring and stable parent are paramount"].)

### 2. *Ysabella*

The juvenile court also did not abuse its discretion in concluding Ysabella's sibling relationships did not outweigh the stability and permanence Cleotilde could provide by adopting her. Ysabella did spend more time with Jesus and Victoria than Emma did, and the court acknowledged Emma developed strong relationships with her older siblings. Nevertheless, like Emma, Ysabella had already experienced considerable instability caused by moving multiple times over the course of this case, from

13

Annel's home to a maternal aunt's home, to Cleotilde's home, to a foster home after Annel abandoned her, and back to Cleotilde's home.  The juvenile court acted well within its discretion in ruling Ysabella's best chance at growing up in a stable and permanent home was with Cleotilde as her parent.  (See *Elizabeth M.*, *supra*, 19 Cal.App.5th at pp. 775, 783 [where the children had lived in many homes during the dependency proceedings, "the court was fully justified in finding the sense of security and belonging that adoption would bring outweighed any possible disruption in [the children's] relationship with their brothers"]; see also *Celine R.*, *supra*, 31 Cal.4th at p. 61 ["even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption"].)  In addition, Ysabella's medical condition required a high level of care that a stable and permanent home would ensure.  (See *In re Dakota H.* (2005) 132 Cal.App.4th 212, 229 [substantial evidence supported the juvenile court's finding the mother's "loving parental relationship" with her autistic child did not outweigh his "exceptional needs for a stable home and highly competent caregiver"].)

Annel and Arturo argue that the Department's reports did not outline a plan for future sibling visitation and that the court should have disregarded the caregivers' assurances they would facilitate sibling visitation.  Annel and Arturo, however, had the burden to show the caregivers would not facilitate future visitation.  (See *In re D.O.*, *supra*, 247 Cal.App.4th at p. 176 ["it was *appellants' burden* to establish there would be substantial interference, not the [child protective agency's]

14

burden to establish there would not"].) Annel and Arturo did not make that showing.

The record does not show the court considered the caregivers' commitment to arranging sibling visitation in the future. But even if the court had considered the likelihood of future sibling visits, it did not err. (See *In re D.O.*, *supra*, 247 Cal.App.4th at p. 175 [in considering whether to apply the sibling relationship exception, the court may consider the caregiver's "proven history of, and expressed commitment to, sibling visits"].) Cleotilde will likely be Ysabella's adoptive parent, and when the court placed Jesus and Victoria with Jose in January 2024, the court ordered Jose to ensure the older children continued to have visits at Cleotilde's. And Elizabeth has committed to ensuring Emma maintains her relationship with Ysabella, has taken Emma to Cleotilde's home for sibling visits, and has stayed in frequent contact with Cleotilde regarding visits. Contrary to Annel's assertion she was the "common thread" that allowed the children to live together and maintain a relationship, it was Cleotilde who facilitated, and will facilitate, contact among the siblings. Before Annel relapsed, many of her visits with the children and the sibling visits took place in Cleotilde's home, Cleotilde allowed Annel and all four children to live with her for the eight months Annel had custody of them, and Cleotilde took care of the children after Annel left without arranging for their care. Indeed, during the six months after Annel's relapse, Annel did not visit Emma at all and visited the three oldest children only three times. The record does not support Annel's assertion that preserving her parental rights would maintain the relationship between Emma, Ysabella, and their older siblings. (See *Elizabeth M.*, *supra*, 19 Cal.App.5th at

15

p. 782 [sibling relationship exception did not apply where "nothing in the record suggested [the children's] relationship with their brothers, whatever it may have been, would be severed if they were adopted by their current caregivers"]; *D.O.*, at p. 175 ["it is not a foregone conclusion that terminating parental rights will substantially interfere with a sibling relationship"].)

## DISPOSITION

The juvenile court's orders terminating Annel's and Arturo's parental rights are affirmed.


SEGAL, J.


We concur:


MARTINEZ, P. J.


STONE, J.

16