Filed 9/13/23  In re L.J. CA4/2
See Dissenting Opinion

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.J., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E080296 |
| Plaintiff and Respondent, | (Super.Ct.No. J287021) |
| v. | OPINION |
| S.M., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Vincent Uberti and Elena S. Min, by appointment of the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

# I. INTRODUCTION

Defendant and appellant S.M. (Mother) appeals from the December 1, 2022 orders terminating Mother's parental rights to her child, L.J. (born in October 2020), and selecting adoption as L.J.'s permanent plan. (Welf. & Inst. Code, § 366.26.)[1] Mother raises two claims of error in this appeal. First, Mother claims plaintiff and respondent San Bernardino County Children and Family Services (CFS) violated Mother's due process rights by "cancel[ing]" Mother's visits with L.J. without a court order for nearly six months (between June 2 and October 25, 2022) before the December 1, 2022 section 366.26 hearing. Mother claims her inability to visit L.J. during this period prevented her from developing a beneficial relationship with L.J. and, on that basis, from avoiding the termination of her parental rights by showing that the parental-benefit exception to adoption applied to her relationship with L.J. (§ 366.26, subd. (c)(1)(B)(i).)

We conclude that Mother forfeited her due process claim by failing to raise it in the juvenile court. Alternatively, we agree with CFS that any error CFS made in cancelling Mother's visits was harmless beyond a reasonable doubt. Given L.J.'s young age and the entire record, including Mother's record of cancelling visits and not engaging with L.J. during visits before June 2, 2022, there is no reasonable possibility Mother could have forged a beneficial relationship with L.J., such that the loss of the relationship through the termination of Mother's parental rights would have harmed L.J. more than

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

adoption would have benefited L.J.  (*In re Caden C.* (2021) 11 Cal.5th 614, 631, 634, 640.)

Second, Mother claims CFS failed to discharge its duty of inquiry under sections 224.2, subdivisions (a), (b) and (c), by asking L.J.'s father D.J., and L.J.'s paternal and maternal extended family members, whether L.J. may be an "Indian child" under the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.).  We conclude there was no ICWA inquiry error.  Thus, we affirm the section 366.26 orders.

## II.  FACTS AND PROCEDURE

### A.  *L.J.'s Detention*, *the Protective Custody Warrant*, *and Section 300 Petition*

L.J. came to the attention of CFS shortly after L.J. was born in October 2020.  L.J. had no health concerns, but Mother tested positive for controlled substances during her pregnancy with L.J.  Mother had five older children and was receiving reunification services for four of those children in open dependency cases in San Bernardino County.  When L.J. was two days old, CFS took L.J. into protective custody pursuant to a protective custody warrant (§ 340, subd. (b)(2)) and placed L.J. in temporary foster care.

Shortly thereafter, CFS filed a petition alleging L.J. was at risk because Mother had anger management and mental health issues, including bipolar disorder and anxiety disorder; Mother had engaged in domestic violence in the presence of her older children; and Mother lived an unsafe and unstable lifestyle.  (§ 300, subd. (b).)  L.J.'s four older siblings were removed from Mother due to similar concerns.  (§ 300, subd. (j).)  The identity and whereabouts of L.J.'s father was unknown; thus, the ability of L.J.'s father to provide for L.J. could not be assessed.  (§ 300, subd. g).)

3

B. *The Detention Hearing*; *Mother Denies Native American Ancestry*

At the detention hearing on October 21, 2020, Mother was present and denied any Native American ancestry. On the same day, Mother signed "Parent: Family Find and ICWA Inquiry" and "Parental Notification of Indian Status" forms, indicating it was unknown whether Mother had or may have Native American ancestry, and Mother had no Native American ancestry as far as she knew. In earlier proceedings for her older children, Mother denied Native American ancestry.

At the October 21, 2020 detention hearing, Mother identified D.J. as L.J.'s father, the same father as J.J. and N.J., two of Mother's older children. D.J. was not present. Mother was granted visitation for L.J., once weekly for two hours or twice weekly for one hour, to be supervised by CFS or its delegate. On November 2, the court terminated Mother's and D.J.'s services in the other cases, including in the cases for J.J. and N.J., but the court granted Mother six additional months of services under the permanent plans for her four older children.

C. *Jurisdiction and Disposition*

In November 2020, CFS reported that, in the proceedings for the older children in November 2019, D.J. said he was unsure whether he had Native American ancestry. In April 2020, D.J.'s sister (L.J.'s paternal aunt) said, " 'I don't think so, no,' " when CFS asked her whether she was aware of any Native American ancestry in D.J.'s family. In September 2020, L.J.'s maternal grandmother said "her family" had no Native American ancestry. In November 2020, Mother was unemployed, living with the maternal grandmother, and had no permanent home for herself and her children. D.J. did not

4

participate in his court-ordered case plan for J.J. and N.J. and, in November 2020, CFS was unable to reach D.J. by phone.

On November 12, 2020, Mother was present at the jurisdiction and disposition hearing for L.J. D.J. was not present. The court sustained amended allegations of the petition, declared L.J. a dependent, and ordered L.J. removed from parental custody. Mother was granted reunification services and unsupervised, weekly, four-hour visits with L.J. The court bypassed services for D.J., finding D.J. was a mere biological father of L.J. and that it was not in L.J.'s best interest to offer D.J. services. (§ 361.5, subd. (b)(10).) The court found that ICWA did not apply to L.J. L.J. remained in foster care.

D. *The Six-month Review* (*May 2021*)

At the six-month review hearing on May 12, 2021, the court extended Mother's services for L.J. to the 18-month, statutory time limit in April 2022 (§ 366.21, subd. (h)), and continued Mother's weekly, four-hour, unsupervised visits with L.J. Mother's unsupervised visits with L.J. were being held currently with Mother's visits with Mother's older children, including J.J. and N.J.

In May 2021, CFS reported that Mother's anger management skills had "improved a great deal," but Mother still had "work to do." CFS identified Mother's anger as "the safety threat that still needs to be addressed." In particular, Mother had difficulty controlling her anger with CFS staff and with caregivers. At a December 21, 2020 visit, Mother "berat[ed]" J.J.'s caregiver for not handing J.J. to Mother before the caregiver had checked in J.J. at the CFS office, even though Mother had been "previously advised" that the caregivers were to check the children in before handing them to Mother. Mother

5

also brought D.J. to the December 21 visit even though D.J. was not supposed to be there. In an April 1, 2021 visit, Mother yelled at the daughter of J.J.'s caregiver, claiming the daughter had threatened Mother.

E. *The 12-month Review* (*March 2022*)

The 12-month review hearing was originally scheduled for November 9, 2021, but it was set contested and ultimately held on March 21, 2022. In November 2021, CFS was seeking to terminate Mother's services and set a section 366.26 hearing for L.J. In July 2021, L.J. was moved to the foster home where J.J. and N.J. had been living, which later became L.J.'s prospective adoptive home. Also in July 2021, Mother's visits, which were still unsupervised, were moved from CFS's office to a restaurant. Through Mother's older children, CFS learned that Mother was allowing D.J. to attend Mother's visits at the restaurant. Mother initially denied that D.J. was attending visits.

In November 2021, CFS reported that Mother had not been taking full advantage of her visitation time with L.J. On more than two occasions, Mother asked L.J.'s caretaker to pick up L.J. early from the visit, claiming L.J. had a fever, but L.J.'s temperature was normal after the visit. More recently, Mother had been cancelling her visits 60 to 90 minutes before the visits were to begin. During a visit on February 28, 2022, Mother allowed D.J. to speak with J.J. on the phone, even though Mother had been advised not to allow D.J. access to the children.

CFS also reported that Mother was not benefiting from her services. In addition to Mother's anger management issues, CFS was concerned about Mother's "unspecified relationship/contact" with D.J. and her history of allowing D.J. unauthorized access to the

children, given the parents' history of domestic violence. CFS considered D.J. a "safety threat" because he had not participated in services to address his domestic violence, anger management, and substance abuse issues.

D.J. first appeared in the proceedings for L.J. at the 12-month review hearing on March 21, 2022. In response to the court's questions, D.J. said he was unsure whether he had Native American ancestry, but he did not believe and no one had ever told him that he had any Native American ancestry. D.J. denied that he or any of his family members were members of or were enrolled in any tribe; he had no family members who were born, lived, or died on a reservation; and none of his living relatives had ever told him he was a descendant of a member of a tribe. Based on this inquiry, the court found "no reason to know or believe" L.J. was an Indian child. (§ 224.2.) On March 21, D.J. completed "family find" and "parental notification" forms consistent with his statements at the March 21 hearing.

Due to the late timing of the March 21, 2022 12-month review hearing, at the hearing, the parties stipulated and the court ordered Mother's services continued to the April 13, 2022, 18-month review hearing. But on March 21, the court reduced the duration of Mother's weekly visits from four hours to two hours and changed the visits from unsupervised to supervised by CFS. The court authorized D.J. to have monthly, two-hour supervised visits with L.J., separately from Mother.

F. *The 18-month Review* (*April 2022*)

At the 18-month review hearing on April 13, 2022 (§ 366.22), the court placed further restrictions on both parents' visits, including no cell phone use and no bringing

snacks for the children. CFS again recommended that the court terminate Mother's services and set a section 366.26 hearing for L.J. The court continued the hearing to June 2 and combined it with the June 2 section 366.26 hearing for Mother's four older children, including J.J. and N.J.

In April 2022, CFS reported that Mother paid very little attention to L.J. during visits, and L.J. "w[a]nders around the visitation room entertaining herself." At the June 2 hearings, L.J.'s caregiver, who began supervising Mother's visits with L.J. in July 2021, explained that L.J. was "like an infant" in July 2021, so Mother would just "put [L.J.] in a [car seat]" and not be "very interactive" with L.J, but Mother was "very active" with J.J. and N.J. By February or March 2022, L.J. spoke "like she is [a two-year old]." At that time, Mother was "a little" more interactive with L.J., but Mother's "focus" was "really on" J.J. and N.J. When L.J. needed something during visits, L.J. would "go to the caregiver" instead of Mother. L.J. was "thriving and blossoming" in her caregiver's home with J.J. and N.J., and the caregiver was willing to adopt L.J.

CFS also reported that Mother still had not benefited from her services. CFS opined that L.J. would be unsafe if returned to Mother given Mother's unresolved anger management and domestic violence issues, L.J.'s "vulnerability" to "resource conditions" in the home Mother shared with the maternal grandmother, and the maternal grandmother's "past CFS history and child endangerment charges." During an April 26 visit, Mother brought chocolate for the children despite the April 13 order not to bring any snacks for the children. On May 5, Mother cancelled her visit for the day, claiming her ride had a flat tire.

8

At the June 2, 2022 hearings, Mother presented evidence that she had blocked D.J.'s calls to her phone and had obtained a temporary restraining order against D.J. on May 23. The court found that Mother had completed her services but there was "still no benefit or protection." The court terminated Mother's services, set a section 366.26 hearing for L.J., and reduced the frequency of Mother's weekly, supervised, two-hour visits to twice monthly. In the other dependency cases, the court terminated parental rights to three of Mother's four older children, including J.J. and N.J. On June 14, the court granted Mother's request for a permanent restraining order against D.J., for one year, through June 14, 2023. As of September 26, 2022, Mother had been unable to serve the permanent order on D.J.

G. *The Section 366.26 Hearing* (*September 29, 2022*)

In its section 366.26 report, filed on September 19, 2022, CFS recommended that the court terminate parental rights to L.J. and select adoption as L.J.'s permanent plan. The section 366.26 hearing was set contested and was continued from September 29 to December 1, 2022. The September 19 report noted L.J. had made "great strides" in her development with her caregivers, who were now her prospective adoptive parents. L.J. had "a large vocabulary for her age" and spoke "in long sentences." The prospective adoptive parents were in the process of adopting J.J. and N.J., and L.J. was bonded to them.

In the September 19, 2022 report, CFS wrote that L.J. had had *only one visit* with Mother during the post-June 2 reporting period, namely, a supervised video call "on July 18, *2020*." The 2020 date appears to be a typo; the video call must have occurred on

9

July 18, *2022*. In another part of the report, CFS wrote L.J. "ha[d] not had contact or visits with the birth parents or extended relatives," but CFS appears to have meant that there had been no *in person* visits since June 2, 2022.

On September 26, 2022, Mother filed a section 388 petition asking the court to reinstate her reunification services for L.J. Mother argued there were changed circumstances because she had ended her "domestic violence relationship" with D.J. by obtaining the temporary restraining order on May 23. Mother argued it would be in L.J.'s best interest to reinstate Mother's services because Mother and L.J. were "closely bonded" and shared "a close relationship."

In her petition, Mother did not address her visitation with L.J. But in court on September 29, 2022, Mother's counsel told the court that Mother had been "constantly contacting the department, her former worker, attempting to get visits with [L.J.] and has constantly been rebuffed every time." Mother's counsel asked the court to order CFS to "follow up" with Mother so Mother could visit L.J. The court ordered county counsel to make sure "they [(the social worker and CFS staff)] understand there is still a visitation order." Counsel for D.J. told the court that D.J. had been having "the same problem"— contacting CFS about visiting his children and no one would return his calls. The court encouraged the parents' counsel to address their concerns through meetings or e-mails with CFS.

In an interim review report, filed on November 30, 2022, CFS asked the court to deny Mother's section 388 petition. In a November 29 interview, Mother told CFS that she had not been in a relationship with D.J. since June 2020. Mother was living with the

10

maternal grandmother and was seven months' pregnant with a child who was not D.J.'s child. Mother did not know the identity of the father of her current child, saying she "went on a depression swing and did a bunch of stuff." After her new child was born, Mother planned to get a job, even though she had scoliosis, arthritis, and a learning disability that caused her to "have a hard time getting a job." Mother planned to move out of state. She said, "I'm not staying in California so you can rip my baby away from me like you guys did with my other kids and me kill myself for it."

Regarding Mother's visits, the November 30, 2022 report repeated the statement in the September 19 report, that Mother had a "supervised video call" with L.J., "on July 18, *2020* for about 20 minutes." Again, the correct date appears to have been July 18, *2022*. In addition, on October 25, 2022, Mother began having *in person*, supervised visits with L.J., twice monthly, on the first and third Tuesday of every month, for two hours at a CFS office. In the November 30 report, CFS did not explain why, apart from the July 18 video call, Mother did not visit L.J. between June 2 and October 25. But CFS argued that Mother did not have a bond with L.J. "due to Mother not visiting" L.J. "for over 6 months until recently, as stated" in the report.

At the December 1, 2022 section 366.26 hearing, the court denied Mother's section 388 petition, after concluding the petition did not make a prima facie showing of changed circumstances or that L.J.'s best interests would be served by granting Mother additional reunification services. Next, the court proceeded to the section 366.26 hearing and accepted CFS's reports into evidence.

11

Mother testified she had been visiting L.J. "through last week or the week before that," but claimed CFS had "cancelled all" of her visits since her parental rights to J.J. and N.J. were terminated on June 2, 2022. During the recent visits, L.J. "smiled at" and "walked to" Mother, Mother and L.J. played with stuffed animals, and L.J. would sit on Mother's lap and would hug Mother. When asked what L.J. called Mother, Mother said L.J. "doesn't really talk." L.J. did not react emotionally at the beginnings or the ends of her visits with Mother.

Mother's counsel argued that the parental-benefit exception to adoption applied based on Mother's bond with L.J. Thus, Mother's counsel asked the court to place L.J. in a long-term guardianship rather than select adoption as L.J.'s permanent plan and terminate parental rights to L.J. The court found that the parental-benefit exception did not apply, selected adoption as L.J.'s permanent plan, and terminated parental rights to L.J. Mother timely appealed.

## III. DISCUSSION

A. *Mother Forfeited Her Due Process Claim, and Any Error in Cancelling Mother's Visits Was Harmless Beyond a Reasonable Doubt*

Mother claims CFS violated her due process rights by "cancelling " her visits with L.J. after June 2, 2022—the date the court terminated Mother's parental rights to her older children, terminated Mother's reunification services for L.J., and reduced the frequency of Mother's two-hour, CFS-supervised visits with L.J. from weekly to bimonthly. Mother claims CFS " 'rebuffed' " Mother's "constant" attempts to schedule visits with L.J. after June 2 and did not allow Mother to resume her visits with L.J. until

12

shortly before the December 1 section 366.26 hearing.  Mother claims the cancelled visits prevented Mother from showing she had a parental bond with L.J. and from avoiding the termination of Mother's parental rights, by showing that the parental-benefit exception to the preference for adoption and termination of parental rights applied to her relationship with L.J.  (§ 366.16, subd. (c)(1)(B)(i).)

We conclude Mother forfeited her due process claim because she did not raise it in the juvenile court before or at the time of the section 366.26 hearing.  Alternatively, we conclude that any CFS error in denying Mother visitation with L.J. after June 2, 2022 was harmless beyond a reasonable doubt.  Any cancelled visits between June 2. and October 25, when the record shows Mother resumed visiting L.J., could not have affected the court's ruling that the parental-benefit exception did not apply.

1.  Legal Principles

"The federal and state Constitutions guarantee that no state shall deprive any person of life, liberty, or property without due process of law."  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306-307.)  Although "due process" guarantees apply to dependency proceedings, the concept of due process cannot be precisely defined.  (*In re Dakota H.* (2005) 132 CalApp.4th 212, 222.)  In determining the process that is due in a particular case, the court evaluates three elements:  the private interests at stake, the government's interest, and the risk the procedures used will lead to an erroneous decision.  (*Lassiter v. Dep't of Social Services* (1981) 452 U.S. 18, 27; *In re A.S.* (2009) 180 Cal.App.4th 351, 359.)  "The private interest at stake in a dependency proceeding is enormous.  A parent's interest in the companionship, care, custody and management of his or her children is a

13

fundamental civil right. Children, too, have a compelling independent interest in belonging to their natural family. [Citation.] In addition, each child has a compelling interest to live free from abuse and neglect in a stable, permanent, placement with an emotionally committed caregiver. [Citation.] The government's interest in a child's welfare is [also] significant. '[T]he welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.' " (*In re Dakota H.*, at p. 223.)

In dependency proceedings, courts balance the competing interests of parents, children, and the government. Until reunification services are terminated and the section 366.26 hearing is set, "the parents' interest in reunification is given precedence over a child's need for stability and permanency." (*In re Julia U.* (1998) 64 Cal.App.4th 532, 543.) But after reunification services are terminated and the section 366.26 hearing is set, the focus of the dependency proceedings shifts from the parents' interest in reunification to the child's interest in permanency and stability. (*In re Dakota H.*, *supra*, 132 Cal.App.4th at p. 223; *In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) After reunification services are terminated, a parent still has a due process right to visitation unless the court finds the parent's visits would be detrimental to the child. (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1504; § 366.21. subd. (h).) "Meaningful visitation is pivotal to the parent-child relationship, even after reunification services are terminated." (*Hunter S.*, at p. 1504; see *In re Julie M.* (1999) 69 Cal.App.4th 41, 49.)

Our Supreme Court has held that the statutory procedures used for termination of parental rights satisfy due process requirements only because of the demanding requirements and multiple safeguards built into the procedures. (*Cynthia D. v. Superior*

14

*Court* (1993) 5 Cal.4th 242, 256; *In re Marilyn H.*, *supra*, 5 Cal.4th at pp. 307-308; *In re Hunter S.*, *supra*, 142 Cal.App.4th at p. 1504.) "If a parent is denied those safeguards through no fault of her own, her due process rights are compromised." (*In re Hunter S.*, at p. 1504.) Likewise, the erroneous denial of parent-child visitation, after reunification services are terminated, "compromises a parent's due process rights to litigate and establish" the parental-benefit exception to the adoption preference. (*In re Valerie A.* (2007) 152 Cal.App.4th 987, 1007.) "Courts have long recognized that . . . a lack of visitation may 'virtually assure[] the erosion (and termination) of any meaningful relationship' between mother and child." (*In re Hunter S.* at p. 1504.)

The parental-benefit exception applies if, "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "the parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) To establish the exception, a parent must prove three elements by a preponderance of the evidence: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 631; *In re Valerie A.*, *supra*, 152 Cal.App.4th at p. 1007 [noting preponderance of evidence standard of proof].)

In enacting the parental-benefit exception, the Legislature "provided a means by which even a parent to whose custody a child cannot currently be returned has a final chance to avoid termination of parental rights if she can show she has maintained regular contact and visitation with her child, and the child would benefit from continuing the

15

relationship.  Obviously, the only way a parent has any hope of satisfying this statutory exception is if she maintains regular contact with her child. . . .  [F]or the parent deprived of visitation, 'it is a forgone conclusion that [she] is not going to be able to establish the exception or have any meaningful chance to avoid the termination of parental rights.' " (*In re Hunter S.*, *supra*, 142 Cal.App.4th at pp. 1504-1505.)

 2.  Mother Forfeited Her Due Process Claim

Under the forfeiture doctrine, an appellate court will ordinarily decline to exercise its discretion to consider a party's challenge to a juvenile court's ruling if the party failed to object to the ruling in the juvenile court.  (*In re L.C.* (2023) 90 Cal.App.5th 728, 737-738.)  The purpose of the forfeiture doctrine is to encourage parties to bring errors to the attention of the juvenile court so the errors may be corrected.  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293; *In re Dakota H.*, *supra*, 132 Cal.App.4th at pp. 221-222 [The forfeiture doctrine "is intended to prevent a party from standing by silently until the conclusion of the proceedings."].)

Here, the record does not show that Mother attempted to correct CFS's alleged cancellation of her visits with L.J. by asking CFS to allow Mother to make up her cancelled visits or by asking the court to order CFS to allow Mother to make up her cancelled visits.  For this reason, Mother has forfeited her due process claim.

On September 29, 2022, counsel for the parties appeared in court for the section 366.26 hearing, and the hearing was continued to December 1, 2022.  On September 29, Mother's counsel told the court that Mother had been unable to visit L.J. since June 2, 2022, because CFS had "constantly . . . rebuffed" Mother's attempts to arrange visits with

16

L.J. after the court terminated Mother's reunification services for L.J. (and Mother's parental rights to her older children) on June 2, 2022. Counsel for D.J. said D.J. had been having "the same problem;" no one at CFS would return D.J.'s calls about visiting his children. Mother's counsel asked the court to order CFS to "follow up" with Mother so Mother could visit L.J. The court ordered county counsel to make sure "they [CFS staff] understand there is still a visitation order." The court also encouraged the parents' counsel to address any concerns the parents had with CFS through meetings with CFS or emails to CFS.

The record does not show, however, that Mother or her counsel ever raised the matter of Mother's cancelled visits with CFS or the court, at any time after September 29, 2022, including at the December 1, section 366. 26 hearing. After September 29, neither Mother nor her counsel asked CFS or the court to allow Mother to make up any of Mother's cancelled visits, or to continue the section 366.26 hearing to allow Mother to make up the visits. Moreover, at the December 1 section 366.26 hearing, Mother did not claim, as she does now, that CFS violated her due process rights, or prevented her from establishing the parental-benefit exception, by canceling her visits after June 2.

At the December 1, 2022 hearing, Mother testified that CFS had "cancelled all" of Mother's visits since June 2, and Mother had only recently been able to visit L.J. Shortly before the hearing, CFS reported Mother began visiting L.J. every first and third Tuesday of the month beginning on October 25. Thus, Mother visited L.J. on October 25, and twice in November, before the December 1 hearing. But on December 1, Mother did not testify, and Mother's counsel did not argue, that any of Mother's cancelled visits had any

17

impact on Mother's ability to prove the parental-benefit exception. Rather, Mother and her counsel were completely silent on the due process issue. Mother and her counsel attempted to prove the parental-benefit exception based on Mother's relationship with L.J. at the time of the December 1 hearing, without claiming CFS violated Mother's due process rights and prevented Mother from forging a beneficial relationship with L.J. by cancelling Mother's visits with L.J. after June 2.

By remaining silent on her due process claim in the juvenile court, Mother has forfeited the claim for appeal. (*In re Dakota H.*, *supra*, 132 Cal.App.4th at pp. 221-222.) Had Mother raised the due process claim at or before the December 1 hearing, the court could have remedied the alleged due process violations by allowing Mother to make up her cancelled visits with L.J. and by continuing the section 366.26 hearing, if necessary, to allow Mother to make up her cancelled visits. Mother's September 29 complaint and December 1 testimony about the cancelled visits, without arguing the cancellations violated Mother's due process rights and prevented her from establishing the parental-benefit exception, was insufficient to preserve the due process claim for appeal.

3. <u>Any CFS Error in Cancelling Mother's Visitation Was Harmless</u>

CFS claims any error it made in "cancelling" Mothers visits with L.J. after June 2, 2022 was harmless beyond a reasonable doubt. We agree.

Due process violations in dependency proceedings are subject to harmless error analysis under the beyond-a-reasonable-doubt standard. (*In re L.J.* (2023) 89 Cal.App.5th 741, 754; *In re J.S.* (2017) 10 Cal.App.5th 1071, 1080-1081.) That is, an order claimed to be affected by a due process violation must be reversed unless the record

18

shows there is no reasonable possibility the violation contributed to the order. (See generally *Chapman v. California* (1967) 386 U.S. 18, 24.)

Based on the entire record, we discern no reasonable possibility that any alleged "cancellation" by CFS of Mother's bimonthly visits with L.J., after June 2 until October 25, 2022, affected the juvenile court's determination, on December 1, 2022, that the parental-benefit exception did not apply. As noted, a parent must prove three elements to establish the exception: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 631.)

The court found that Mother failed to prove all three elements. Regarding the second and third elements, the court found Mother did not show she had a beneficial relationship with L.J., such that the loss of that relationship would have harmed L.J. "to an extent not outweighed, on balance, by the security of a new, adoptive home." (*In re Caden C.*, *supra*, 11 Cal.5th at pp. 631, 634.) We discern no reasonable possibility that Mother could have made *this showing*, *even if* Mother could have had nine additional, two-hour visits with L.J. between June 2 and October 25, 2022.

Mother did not have a strong bond with L.J. prior to June 2, 2022. Mother did not consistently visit L.J. early in the proceedings, when Mother was allowed unsupervised, weekly, four-hour visits with L.J. In November 2021, CFS reported that Mother had cancelled several visits and had ended at least two visits early. Mother also showed little interest in L.J. during her subsequent, supervised visits with L.J. From July 2021, when

19

L.J. was nine months old, through April 2022, when L.J. was 18 months old, Mother did not engage with L.J. during visits. Instead, Mother focused on J.J. and N.J., and allowed L.J. to wander "around the visitation room entertaining herself." L.J. would go to her caregiver, who was supervising the visits, if L.J. needed anything during the visits. Additionally, L.J. was just over two years old at the time of the section 366.26 hearing on December 1. At that time, L.J. was closely bonded with her prospective adoptive parents, with whom she had been living since she was nine months old in July 2021.

At the section 366.26 hearing on December 1, 2022, Mother testified that Mother and L.J. had a loving relationship. During her most recent visits with L.J. (in October and November 2022), L.J. sat on Mother' lap. and showed affection by hugging Mother and holding Mother's hand. But L.J. was never sad or upset when the visits ended. Based on the entire record, including L.J.'s young age, her attachment to her prospective adoptive parents, and her strong interest in the stability and permanency that a new, adoptive home could provide her, there is no reasonable possibility that Mother, with only nine additional visits with L.J. between June 2 and October 25, 2022, could have forged a beneficial relationship with L.J., such that the loss of that relationship would have harmed L.J. *more than* the loss of a new adoptive home. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 634.)

B. *There Was No ICWA Inquiry Error Concerning D.F. or Extended Family Members*

Mother claims CFS erroneously failed to ask D.J.'s and L.J.'s extended family members whether L.J. is or may be an Indian child for purposes of determining whether ICWA applied to the proceedings for L.J. We find no ICWA inquiry error.

1. Sufficient Inquiry Was Made of D.J.

To implement ICWA, the county welfare department and the juvenile court have a duty to determine whether a dependency case involves an Indian child. "The duty to inquire consists of two phases—the duty of initial inquiry and the duty of further inquiry." (*In re Ricky R.* (2022) 82 Cal.App.5th 671, 678.) This case does not involve the duty of further inquiry, which arises only if the court or the department has "reason to believe that an Indian child is involved." (§ 224.2, subd. (e).)

"Federal regulations require state courts to ask each participant 'at the commencement' of a child custody proceeding 'whether the participant knows or has reason to know that the child is an Indian child.' (25 C.F.R. § 23.107(a) (2022).)" (*Ricky R., supra,* 82 Cal.App.5th at pp. 678-679.) Similarly, "[s]tate law requires the court to pursue an inquiry '[a]t the first appearance in court of each party' by asking 'each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child.' (§224.2, subd. (c).)" (*Ricky R.*, at p. 679.) In addition, the court and department have "an affirmative and continuing duty" to inquire whether a child in a dependency proceeding "is or may be an Indian child." (§ 224.2, subd. (a).)

Mother claims "CFS did not make any inquires of [D.J.] during this case; CFS simply reproduced its undated inquiry of [D.J.] from a prior CFS case." Mother is incorrect. The court made sufficient inquiries of D.J. when D.J. first appeared in the proceedings for L.J. at the 12-month review hearing on March 21, 2022. (§ 224.2, subd. (c).) In response to the court's questions at the hearing, D.J. said he did not believe, and no one had ever told him, that he had any Native American ancestry, and neither he nor

21

any of his living relatives were members of an Indian tribe.  Father also completed "family find" and "parental notification" forms, consistent with his responses to the court's inquiry.

2.  The Duty To Interview Extended Family Members Never Arose

Section 224.2, subdivision (b) provides:  "If a child is placed into the temporary custody of a county welfare department pursuant to Section 306 . . . , the county welfare department . . . has a duty to inquire whether that child is an Indian child.  Inquiry includes, but is not limited to, asking . . . extended family members . . . whether the child is, or may be, an Indian child . . . ."

There is a split of authority in this court on the question of whether the duty to inquire of extended family members under section 224.2, subdivision (b), applies (1) only when a child is taken in temporary custody under section 306, or (2) applies in every case, regardless of whether the child is taken into "temporary custody" without a warrant under section 306 or is taken into "protective custody" pursuant to a warrant under section 340.  In three decisions, several panels of this court have adopted the first view. (*In re Robert F.* (2023) 90 Cal.App.5th 492, 500-501, 503-504 (*Robert F.*), review granted July 26, 2023, S279743, following *In re Adrian L.* (2022) 86 Cal.App.5th 342, 357-370 (conc. opn. of Kelley, J.); *In re Ja.O.* (2023) 91 Cal.App.5th 672, 677-678 (*Ja.O.*), review granted July 26, 2023, S280572; and *In re Andres R.* (2023) (Aug. 23, 2023, E079972)___Cal.App.5th___[2023 Cal.App.Lexis 638] (*Andres R.*).)  In a fourth decision, another panel of this court disagreed with *Robert F.* and concluded, "there is only one duty of initial inquiry, and that duty encompasses available extended family

22

members no matter how the child is initially removed from the home." (*In re Delila D.* (2023) 93 Cal.App.5th 953, 962 (*Delila D.*), petn. for review filed Aug. 22, 2023, S281447.)

Mother argues that *Delila D.* was correctly decided and that *Robert F.*, *Ja.O.*, and *Andres R.* are based on a misinterpretation of section 224.2 as a whole and its legislative history. Mother claims that, under *Delila D.*, DPSS failed to interview J.L.'s extended family members, including the paternal grandmother who was "present at one, if not more, of Mother's visits" and other paternal and maternal extended family who were "referenced" by Mother and D.J. Mother further argues that the failure to inquire of these extended family members was prejudicial because any of the extended family members may have had "readily obtainable information tending to shed meaningful light" on whether L.J. is an Indian child. (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739.)

Pending a contrary decision by our Supreme Court, we agree with the reasoning of *Robert F.*, *Ja.O.*, and *Andres R.*, and disagree with the reasoning of *Delila D.* Thus, we conclude that DPSS's obligation to interview L.J.'s extended family members about L.J.'s possible status as an Indian child, under section 244.2, subdivision (b), was never triggered, or never arose, given that L.J. was taken into protective custody pursuant to a protective custody warrant. (*Robert F.*, *supra*, 90 Cal.App.5th at pp. 500-501; § 340.)

Furthermore, CFS did not have a duty to interview extended family members under section 224.2, subdivisions (a) or (c), given that, throughout the proceedings, there was never any indication that L.J. is or could be an Indian child. As *Robert F.* explained, section 224.2, subdivisions (a) and (c) "describe the duty of inquiry that arises in every

dependency case. But the plain language of those subdivisions does not require the county welfare department or the court to question extended family members as part of the initial inquiry in every case. And although case-specific circumstances may require the department to interview extended family members under one of those subdivisions, Mother has not identified any such circumstances here. For instance, if the parents deny any Indian ancestry, but a family member later contacts the social worker and volunteers that the family has Indian ancestry, then the department cannot ignore that claim. It has a duty to follow up on the information as part of its 'affirmative and continuing duty to inquire.' (§ 224.2, subd. (a).) Similarly, if a parent states that they do not know whether they have Indian ancestry and directs the social worker to ask a particular relative who would know, then the department must follow up with that relative as part of its affirmative and continuing duty of inquiry. It cannot ignore the information. Nothing similar occurred in this case." (*Robert F.*, *supra*, 90 Cal.App.5th at p. 504.)

## IV.  DISPOSITION

The December 1, 2022 orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

I concur:


CODRINGTON_____
             Acting P. J.

24

[*In re L.J.*, E080296]

RAPHAEL, J., Dissenting.

I respectfully dissent.  I would apply rule 5.481(a)(1) of the California Rules of Court and *In re Delila D.* (2023) 93 Cal.App.5th 953, which require inquiry of readily available extended family as to whether a child is Indian in every dependency matter where a child is removed from the parents.  Instead, the majority follows caselaw that "disapprove[s]" that rule of court (*In re Andres R.* (August 23, 2023, E079972) [2023 Cal.App. Lexis 638, *1]) insofar as it requires inquiry of extended family where the child is removed by warrant, rather than without a warrant.  Such a distinction does not make sense and is not what the Legislature intended.  (See also *In re Jerry R.* (September 11, 2023, F085850) [2023 Cal.App. Lexis 697] [following *In re Delila D.*]; *In re V.C.* (September 6, 2023, A166527) [2023 Cal.App. Lexis 687] [following *In re Delila D.*].)

RAPHAEL                     
J.