Filed 5/12/25  In re Ke.B. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re Ke.B. et al., Persons Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> K.R., <br><br> Defendant and Appellant. | F088854 <br><br> (Super. Ct. Nos. JD141569-01 & JD141570-01) <br><br> **OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Elizabeth M. Giesick, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

K.R., mother of minor children Ke.B. and Ka.B. appeals from the juvenile court's order terminating her parental rights at a Welfare and Institutions Code[1] section 366.26 hearing. She contends the court erred by declining to apply two statutory exceptions to the termination of parental rights: the beneficial parent-child relationship exception (§ 366.26, subd. (c)(1)(B)(i)) and the sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)). She also contends the court erred by finding the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA) did not apply to the proceedings because the Kern County Department of Human Services (department) failed to make adequate inquiry into whether the children were potentially Indian children within the meaning of ICWA.

We conditionally reverse the order terminating parental rights and remand for compliance with the inquiry provisions of ICWA. In all other respects, we affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

In February 2023, mother was involved in a traffic collision and was hospitalized. The department received a referral alleging general neglect and caretaker absence/incapacity as to mother's six minor children, including the two children subject to this appeal, as it was unknown as to whether mother would recover from her injuries, and it was assumed the children were in the custody of R.B. (father), who had an active restraining order protecting the children from him.

The investigating social worker confirmed there was an active criminal protective order set to expire in 2031 protecting mother and Ke.B. and Ka.B.'s three older siblings from father. The investigating social worker also learned mother had suffered a traumatic brain injury (TBI) and a pelvic fracture and had undergone brain surgery. Mother was in

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

2.

the ICU and improving. The social worker and police contacted father and discovered the children were in his custody.

A plan was made for the children to be placed in the care of mother's friend while father worked to see if the restraining order could be lifted. Upon mother's release from the hospital, she stayed with the friend and the children. Mother was having difficulty getting around and understanding what was going on. Mother's friend was having difficulty caring for the children and mother, and mother displayed concerning behaviors the friend could not control such exhibiting anger and trying to fight everyone in the home and pulling a knife on the friend. Mother eventually went to live with father, and the friend expressed she was unable to continue caring for the children.

The children were taken into protective custody on March 15, 2023. On March 17, 2023, the department filed juvenile dependency petitions on behalf of then three-year-old Ka.B. and then four-year old Ke.B., and their four older siblings, who are not subjects of this appeal, alleging they came within the juvenile court's jurisdiction under section 300, subdivision (b)(1) because they had suffered or were at risk of suffering harm by mother's inability to provide regular care for them due to her traumatic brain injury.[2]

---

[2] The specific allegations found true were: "The [children] ha[ve] suffered, or there is substantial risk that the child[ren] will suffer, serious physical harm or illness by the inability of … mother … to provide regular care to the child[ren] due to … mother's traumatic brain injury. On February 6, 2023, … mother was in a car accident, which resulted in a traumatic brain injury. [M]other has struggled to provide care for herself or the child[ren]. Since … mother's release from the hospital, she has pulled a knife on her caregiver, and attempted to fight other individuals residing in her caregiver's home. [M]other was residing with … father … despite an active restraining order being in place until May 17, 2031. As a result of [mother's] injury, [mother] has struggled to care for herself, [and] this places the children [at] risk."

The petition also alleged harm due to the parents leaving them with no provision for support under section 300, subdivision (g), but these allegations were dismissed without prejudice.

In its detention report, the department reported the family had a history of child welfare referrals, many of which were deemed unfounded. In 2020, however, a referral for general neglect was substantiated related to the parents having several recent domestic violence incidents. The children were placed in protective custody and a dependency petition was filed. The children were subsequently released to mother on the conditions that she follow through with obtaining a restraining order against father and complete services, and the petition was subsequently dismissed. It was further reported that mother had a minor criminal history, and father had a lengthier criminal history, consisting of a 2010 domestic violence offense and several convictions for violating domestic violence protective orders, the most recent of which was from January 2023.

The children were ordered detained from the parents on March 23, 2023. On May 11, 2023, mother was appointed a guardian ad litem (GAL) at her counsel's request based on the juvenile court's finding she did not understand the nature of the proceedings and was not capable of assisting her attorney in protecting her rights.

Mother waived her rights to a jurisdictional hearing (there were no allegations pertaining to father), and on June 7, 2023, the juvenile court found the children were described by section 300, subdivision (b) and appointed doctors to perform psychological evaluations of mother to determine whether she would benefit from reunification services. The court continued the matter as to disposition to allow time for the evaluations to take place.

The parents began participating in voluntary services. Mother underwent her psychological evaluations. The reports indicated mother had been previously diagnosed with Bipolar II disorder, Schizophrenia disorder, and panic attacks. One of the doctors opined she was a good candidate for family reunification services and recommended specific services. The other clinician diagnosed her with mood disorder secondary to TBI and mild intellectual disability secondary to TBI and opined she could not independently

care for the children or keep them safe, as the traumatic brain injury she suffered, "exacerbated her bipolar disorder and schizophrenia," and compromised her "mood control" which could be "rapid and violent." The latter clinician opined mother required "extensive cognitive retraining intervention, mental health treatment, and medication to help with mood stabilization" and "[i]t is not possible, in my opinion, for this young lady to complete a reunification process in the foreseeable future."

The parents also began attending visitation with the children. Several positive interactions between mother and the children were documented, however, there were also several issues with mother getting agitated and becoming verbally aggressive toward visit supervisors, which sometimes resulted in visits being cancelled. In July 2023, the visitation center cancelled the referral due to mother's behavior toward staff members.

The department recommended the parents be provided with family reunification services.

At the disposition hearing conducted on September 28, 2023, the juvenile court adjudged the children dependents of the court, ordered them removed from the parents' physical custody, and ordered the parents to participate in family reunification services. Mother's case plan consisted of services recommended by one of the clinicians who performed her evaluation: mental health counseling, which could include psychiatric medications if she was unable to manage her symptoms; a parenting technique class; a child-neglect endangerment class, a parent empowerment program, specifically "Building on Five Protective Factors"; a coping life skills class; and a counseling group for child development.

During the first six-month review period, the parents participated in their case plan components. They had the opportunity to visit the children 24 times and visited nine times. The parents were observed to interact appropriately with the children and provide individual attention to each child. On a couple of occasions throughout the review

5.

period, mother was accidentally injured during a visit and asked to suspend visitation to recover from her injury.

The department recommended services be continued. It reasoned that though the parents were participating in their case plans, they had missed approximately half their visits and had not been able to demonstrate they were capable of handling the children for long periods of time.

At the six-month review hearing conducted on March 28, 2024, the juvenile court continued reunification services to the parents.

During the six- to 12-month review period, the parents continued to participate in their case plans. During visitation, mother interacted well with the children but continued to be verbally aggressive toward visit supervisors, and threatened to physically harm one of the social workers in front of the children. When mother made the threat of physical violence, her 17-year-old son had to attempt to calm her down. On another occasion, mother was recording the visit, and at one point, Ka.B. hit the supervisor. Mother continued recording and laughed. Father would look to the social worker for guidance when mother acted aggressively.

The department recommended reunification services be terminated. While the parents participated in their case plan and completed some components, they were observed to "have shown no behavioral change." Mother's anger and aggressive behavior had escalated. Father remained in a relationship with mother and had not provided proof of housing appropriate for himself and the children and had not shown he was able or willing to protect the children from mother. He had additionally not provided proof of compliance of the mental health component of his case plan. The parents had missed half of their scheduled visitation and had not been able to demonstrate they could handle having the children for long periods of time. It was reported the parents requested

6.

to suspend visits for long periods of time when mother was not feeling well, and father did not attend visits without mother.

At the 12-month review hearing conducted on May 15, 2024, the juvenile court denied mother's request for further reunification services and father's request for return of the children. In analyzing whether it could continue services beyond 12 months, the court found the parents had visited consistently and regularly even though they "missed one or two [visits] here and there." The court found the parents had not made significant progress in resolving the problems that led to the children's removal nor that they had demonstrated the capacity and ability to complete the objectives of the treatment plan and to provide for the children's well-being, given the escalation of mother's behaviors and that they were "impacting the children in a negative way and … father doesn't know how to redirect her or the situation." The court noted, "[t]he visits are a brief glimpse that this Court has on how life would be like if the children were returned, and it's not positive." The court accordingly found there was not a substantial probability the children would be returned within the statutory time and thus the requirements for setting an 18-month review hearing were not met. The court additionally found family maintenance for father was not appropriate. The court set a section 366.26 hearing for Ke.B. and Ka.B.

In its section 366.26 report, the department recommended the juvenile court order adoption with their care provider (who also had placement of their older brother) as Ke.B.'s and Ka.B.'s permanent plan and that parental rights be terminated.

It was reported Ka.B. had been in two placements, and had been with his current care provider since April 2023. Ke.B. had had six placements before being placed with Ka.B. and their older brother in May 2024. For a short time, Ke.B. was placed with her older sister, but ended up being in a separate placement for some time due to her sister's behavioral issues.

According to the report, mother had visited Ke.B. 66 times and Ka.B. 64 times out of a possible 123 visits.  The report stated, "mother interacted appropriately with the children by showing appropriate affection, bringing food and snacks, and engaging with them appropriately.  However, on multiple occasions … mother interacted inappropriately with staff by cursing, threatening, and being aggressive towards them in front of the children."  It was further stated that two staff members and a security guard were required for visitation with mother and that visitation frequently ended early due to mother's behaviors.

The report indicated it would not be detrimental to terminate parental rights over Ke.B. and Ka.B. as they knew mother and enjoyed visits but did not show signs of distress when leaving mother's care at the end of visits or in their placement when mother was absent or when visits were cancelled.  Mother called the children, but the children did not ask to call mother or ask for her independently.

The report further indicated sibling visits had been appropriate.  It was reported the children visited for four hours, two by themselves and two with the parents.  They did not like to interact together the entire time and would separate into two groups and do different activities.  The report indicated "it would be beneficial to continue the bond between the siblings," but Ke.B. and Ka.B.'s care provider was "undecided" on how continued contact with the three siblings outside her home would be maintained.

When the social worker spoke to Ke.B. about plans of adoption and legal guardianship and asked where she would live if she could live anywhere and with anyone in the world, she responded, "in an ice cream truck, with no one only me."  Ke.B. later stated she might want to live with her older sister, but no one else.  She reported enjoying living with her care provider because everyone, except Ka.B., was nice to her, and her care provider did her hair.  Ke.B. reported liking visits with her parents and siblings and liked visiting with her siblings more.  Ke.B. was unable to explain or understand what

adoption and legal guardianship was. When asked how she would feel if she could not visit her family again, she responded, "sad." Ke.B. then stated she would like to live with mother. When the social worker asked her if she would be fine living with her care provider if she could not be returned to mother's care, she stated "yes" and that she wanted to keep visiting mother.

When Ka.B. was asked where he would live if he could live anywhere with anyone, he reported he wanted to live in a Halloween store with only his brothers. He reported liking living with his care provider and stated he would like to live with mother. He said his visits were "good." He appeared to be confused about what adoption and legal guardianship meant. When asked how he would feel if he could not visit his family again, he said "I don't know." Ka.B. then tried changing the subject and did not want to return to the topic of adoption and guardianship.

Ke.B. and Ka.B.'s care provider wished to adopt them. She felt as though they became part of her family quickly and she "love[s] them so much" and saw them all "as one big happy family." The care provider's 14-year-old son reported he thought the adoption was great, that it felt "normal" to have Ke.B. and Ka.B. in the home and he "really like[d] them." It was reported Ke.B. and Ka.B. appeared "happy, comfortable, and easily comforted" by their care provider and had "formed a parental relationship" with her.

With regard to ICWA, the department filed a declaration detailing their ICWA inquiry efforts ahead of each hearing, including contacting various family members and sending inquiries to multiple tribes. They never uncovered evidence that the children were Indian children. As relevant to the issues on appeal, the department reported in its May 2024 declaration that in April 2024, the paternal grandfather reported Native American ancestry with "Dakota through his father's side." To investigate this claim, the declarant, department paralegal Peggy Byrd, stated she "searched Bureau of Indian

9.

Affairs most up to date BIA Federal Register and ICWA Designated Agents Listing located here: https://www.bia.gov/bia/ois/dhs/icwa. No tribe by the name of Dakota is listed." She further stated she "contacted the BIA social worker, Jesse Abernathy by email and inquired if Dakota is a tribe or affiliated with a federally recognized tribe" and attached a copy of the email. No response to that e-mail was presented to the juvenile court by way of the May 2024 declaration or any subsequent declaration. The court, at various points throughout the proceedings, found, without prejudice, there was a not a reason to know the children were Indian children within the meaning of ICWA.

The section 366.26 hearing was conducted on October 14, 2024. Mother lodged the following objection: "[W]e are objecting to the recommendations and asking that the Court consider a different permanent plan for these children. It's very obvious that the mother loves these children, and that the incident that brought the children into protective custody is very sad given the condition of the mother, and so I'm submitting it with those comments." Father's counsel also objected generally to adoption. Minor's counsel submitted without comment. Counsel for the department noted that no party had asserted the sibling relationship exception to adoption applied.

In ruling, the juvenile court analyzed the beneficial parent-child relationship exception: the court found the parents had not regularly and consistently visited the children; there was not a substantial, positive, emotional attachment between the children and the parents; and the benefits of adoption outweighed any detriment the children would suffer from the termination of the relationship. The court also found there was not a reason to know the children were Indian children. The court selected adoption as the children's permanent plan and ordered parental rights terminated.

## DISCUSSION

## I.  Exceptions to Termination of Parental Rights

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies.  (§ 366.26, subd. (c)(1).)  The court may decline to order termination of parental rights when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child," where, as relevant here, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" (the beneficial parent-child relationship exception) (§ 366.26, subd. (c)(1)(B)(i)) or where "[t]here would be substantial interference with a child's sibling relationship" (the sibling relationship exception) (§ 366.26, subd. (c)(1)(B)(v)).  The parent bears the burden of proving a statutory exception applies by a preponderance of the evidence.  (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*); *In re J.S.* (2017) 10 Cal.App.5th 1071, 1080.)

A court's factual findings are reviewed for substantial evidence and its ultimate determination of whether, in weighing competing interests, the facts constitute a compelling reason for determining termination would be detrimental to the child is reviewed for abuse of discretion.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 636, 639–641; *In re Isaiah S.* (2016) 5 Cal.App.5th 428, 438.)  Under the substantial evidence standard of review, "a reviewing court should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts.'  [Citation.]  The determinations should 'be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' "  (*Caden C.*, at p. 640.)  "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard.  A court abuses its discretion only when ' " 'the trial court has exceeded the

limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.) We keep in mind that when a court finds the proponent of a fact has failed to meet their burden, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"; that is, "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

As a threshold matter, respondent argues mother has forfeited her claims by failing to raise them below. At the section 366.26 hearing, mother made a general objection to the recommendations and requested a permanent plan other than adoption, noting she loved the children but did not raise any of the exceptions to termination of parental rights specifically. The court expressly analyzed the beneficial parent-child relationship exception on the record, but no mention was made of the sibling relationship exception. Mother asserts the claims were adequately preserved, but in the alternative, requests we exercise discretion to review her claims. We will do so. Because the court analyzed the beneficial parent-child relationship exception, we have no difficulty reviewing those findings and determinations to determine that they were appropriate. As for the sibling relationship exception, we have no findings to review, but we can conclude the court was not compelled by the evidence presented to apply the sibling relationship exception. For the reasons that follow, we find the court did not err by declining to apply either exception to the termination of parental rights.

A. ***Beneficial Parent-Child Relationship Exception***

A parent seeking to establish the beneficial parent-child relationship exception applies has the burden of proving three elements to justify the application of the exception: (1) "regular visitation and contact with the child, taking into account the

extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at pp. 632–633, 636–637.)

In determining the second element—whether the children would benefit from continuing the relationship because the child has a substantial, emotional, positive attachment to the parent—the court may consider factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " as well as "how children feel about, interact with, look to, or talk about their parents." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

In determining the third element, courts look at "whether it would be harmful to the child to sever the relationship and choose adoption." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) Courts must "determine … how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life…. [¶] … That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Ibid.*) Courts may consider whether the child will experience effects such as "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression," as well as how a "new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental." (*Ibid.*)

Mother first claims that the juvenile court erred by finding that mother did not consistently or regularly visit the children. She claims the court was bound by the finding at the 12-month review hearing that visitation *was* consistent and regular, as it was the "law of the case." We need not reach this issue because we conclude the court properly found the second and third prongs of the exception were not met.

The court's finding that the children did not have a substantial, positive, emotional attachment to mother was supported by substantial evidence. While the children stated they wanted to be with mother, and they had positive interactions with her at visits, mother displayed troubling behaviors towards others in their presence. The children consistently observed mother losing her temper and treating others poorly, including threatening violence. They also observed their older sibling being the one tasked with calming her down. Mother's inability to control these behaviors were not only observed by the children, but occasionally required her visits with the children to be cut short, depriving the children of limited time with their parents and siblings. Additionally, the children were relatively young and had spent a significant amount of their lives out of mother's custody. The evidence did not compel the court to find the children and mother had a beneficial relationship within the meaning of the statute. Rather, the court only had the department's reports before it, in which the social worker opined permanency was in the children's best interest and that termination would not be detrimental.

Even if we were to assume the second prong was met, we cannot say the court abused its discretion in declining to find the benefits of adoption were outweighed by the benefit the children would gain from continuing their relationship with mother. No party offered evidence that the children would be significantly harmed if the parent-child relationship were to be terminated. The children were doing well and improving in their placements and did not display any severe distress being out of mother's care. Ke.B. was successfully discharged from mental health treatment in May 2024 and Ka.B. participated

in screening, the results of which indicated he was not in need of a referral to mental health services. While the children did express desires to be with mother, they also seemed content with continuing to live in their placement, which indicated they were not experiencing great harm out of mother's care.

For the foregoing reasons, we find no error in the court's decision not to apply the beneficial parent-child relationship exception.

## B. *Sibling Relationship Exception*

In analyzing whether the sibling relationship exception applies, the court must "tak[e] into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

The "purpose of [the sibling relationship] exception is to preserve long-standing sibling relationships that serve as 'anchors for dependent children whose lives are in turmoil.' " (*In re Isaiah S.*, *supra*, 5 Cal.App.5th at p. 437.) The " 'strong language' " used by the Legislature to describe the sibling relationship exception creates a " 'heavy burden for the party opposing adoption.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 61.) The bill's author wrote that use of the sibling relationship exception " 'will likely be rare,' " which has been interpreted to mean that "the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 950.)

Here, as no party argued the sibling relationship exception to termination of parental rights, or offered evidence in support thereof, the court was left with only the department's reports on the issue, wherein the social worker noted it would be beneficial

to continue the children's relationship with their three siblings out of the home "[a]fter the adoption" but made no assertions that the relationship between siblings constituted a reason for determining termination of parental rights would be detrimental to them. The evidence showed the children lived with their older siblings for the first few years of their lives but were removed from mother's custody relatively young and had spent a substantial portion of their short lives out of custody in various placements, sometimes with siblings and sometimes without. Their visits went well, and we recognize that the children love their siblings, but the record simply does not show the children would have suffered detriment that outweighed the benefits of the permanency and stability of adoption. The department had difficulty keeping the siblings together and were unable to find a placement for all six siblings. As for Ke.B. especially, she had experienced many placements throughout the proceedings and had to live in a separate placement for some time but was now experiencing stability and the opportunity for permanence for the first time in a placement with two of her siblings.

Mother briefly states that there "appeared to be confusion" as to whether the siblings, or Ke.B. and Ka.B., needed to file section 388 petitions to assert the sibling relationship exception and this constituted a mistake of law and therefore error. To support this claim, she cites county counsel's statement at the section 366.26 hearing that "there has not been any 388s or anything to file to assert the sibling exception to adoption." This does not establish that any legal error occurred. We read county counsel's statement as simply pointing out that no party was asserting the exception applied. There is no evidence that any of the children, all of whom were represented by counsel, sought to raise the sibling relationship exception on behalf of Ke.B. and Ka.B. and that they were somehow prevented from doing so. Most significantly, Ke.B. and Ka.B.'s counsel, who was given an opportunity to argue at the section 366.26 hearing, merely submitted without any comment.

16.

For the foregoing reasons, we find no error in the court not applying the sibling relationship exception.

## II. ICWA

Under California's statutory scheme to comply with ICWA, the court and county child welfare department "have an affirmative and continuing duty to inquire whether a child," who is the subject of a juvenile dependency petition, "is or may be an Indian child."[3]  (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9; Cal. Rules of Court, rule 5.481(a).)

When the court or social worker has "reason to believe"[4] (but not sufficient evidence to determine there is "reason to know"[5]) that an Indian child is involved in a

---

[3]     An "Indian child" is defined in ICWA as an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized tribe and is the biological child of a member of a federally recognized tribe.  (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

[4]     "There is reason to believe a child involved in a proceeding is an Indian child whenever the court, social worker, or probation officer has information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe.  Information suggesting membership or eligibility for membership includes, but is not limited to, information that indicates, but does not establish, the existence of one or more of the grounds for reason to know enumerated" in section 224.2, subdivision (d)(1)–(6).  (§ 224.2, subd. (e)(1).)

[5]     These enumerated grounds for "reason to know" are:  "(1) A person having an interest in the child, including the child, an officer of the court, a tribe, an Indian organization, a public or private agency, or a member of the child's extended family informs the court that the child is an Indian child[;] [¶] (2) The residence or domicile of the child, the child's parents, or Indian custodian is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding, officer of the court, Indian tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child who is the subject of the proceeding gives the court reason to know that the child is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[;] [¶] [and/or] (6) The court is informed that either parent or the child possess an identification card

17.

proceeding, "further inquiry regarding the possible Indian status of the child" is required. (§ 224.2, subd. (e).) Section 224.2, subdivision (e)(2) enumerates three duties of further inquiry: (1) interviewing the parents, Indian custodian, and extended family members to gather biographical information regarding the child; (2) contacting the Bureau of Indian Affairs (BIA) and the State Department of Social Services for assistance in identifying tribes with whom the child may be affiliated; and (3) contacting tribes, or any other person who may reasonably be expected to have information regarding the child's membership or eligibility for membership in a tribe. (§ 224.2, subd. (e)(2)(A)–(C).)[6]

Before finding ICWA inapplicable, the juvenile court must make a finding that the department conducted "proper and adequate further inquiry" and exercised "due diligence" in doing so, and that "there is no reason to know whether the child is an Indian child." (§ 224.2, subd. (i)(2).)

We review the juvenile court's finding that there is no reason to know whether a child is an Indian child for substantial evidence, and the court's finding that the department has conducted a proper and adequate inquiry and due diligence for abuse of discretion. (*In re K.H.* (2022) 84 Cal.App.5th 566, 600–601.)

Mother contends the juvenile court erred by finding the department had fulfilled its duty of further inquiry because it did not appropriately follow up with the paternal grandfather's claim of "Dakota" ancestry, which would have revealed "Dakota" is

_____

indicating membership or citizenship in an Indian tribe." (§ 224.2, subd. (d); see 25 C.F.R. § 23.107(c) (2025).)

[6]    "Contact with a tribe" for the purpose of the department's duty of further inquiry "shall, at a minimum, include telephone, facsimile, or electronic mail contact to each tribe's designated agent for receipt of notices under [ICWA]" and "include sharing information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C).)

affiliated with several federally recognized Sioux tribes, and thus it failed to obtain this information and contact the relevant tribes.  We agree.

Mother points out the website paralegal Byrd cited in her declaration—www.bia.gov/bia/ois/dhs/icwa—contains a link entitled, "I Can't Find a Tribe in my Search."  Clicking this link reveals a page with the following steps:

> "1.  Review the BIA's most recent list of federally recognized Indian tribes and look for the Tribe.  The BIA's list can be found here: [link to the BIA Federal Register].
>
> "2.  *To ensure a thorough search, please consider the names of any tribal ancestral groups (see below for examples)* and check the spelling of the Tribe's name, which may be different than its pronunciation.  Search in Affiliated Tribes.
>
> "3.  If you need further assistance, please contact the appropriate BIA Regional Social Worker or Central Office at [list of contacts].
>
> "4.  If the Tribe's name does not appear on the BIA's list, then the Tribe is not a federally recognized Indian tribe and ICWA does not apply."  (*I Can't Find a Tribe in my Search* <https://www.bia.gov/bia/ois/dhs/icwa/tribe-search> as of May 12, 2025, italics added.)

Further down that same page, under the heading "Sioux (Sue or Soo) Tribe Breakdown" the text explains that some Sioux tribes call themselves "Dakota" and when someone reports Dakota ancestry, "This could mean they are affiliated with or have membership or citizenship with one or more of the following Federally Recognized Tribes."  Under the "Dakota" heading, the page lists eight tribes.  The page further advises, "If one Tribe cannot be identified, then all Tribes in the group should be sent an ICWA Notice."  (*Ibid*.)

Pursuant to this information on the BIA website, the department should have conducted additional further inquiry into the paternal grandfather's claim of "Dakota" ancestry by contacting relevant Sioux tribes.

19.

Respondent contends we must affirm the juvenile court's findings because this information was not before the juvenile court. To support their position, they cite a quote from *In re D.S.* (2020) 46 Cal.App.5th 1041, 1053 that the department is not required "to 'cast about' for information or pursue unproductive investigative leads."

While we recognize the information stating that "Dakota" is affiliated with several Sioux tribes was not before the juvenile court, the existence of this information, which was readily available with one additional click on the BIA website accessed by Paralegal Byrd, shows that the claim of Dakota ancestry was certainly not an "unproductive investigative lead." The department reported that to investigate the claim, in May 2024, paralegal Byrd (1) checked the BIA website to determine if "Dakota" was on the register of federally recognized tribes and (2) contacted the BIA to determine whether Dakota was affiliated with a federally recognized tribe. This information supports the claim that "Dakota" ancestry required additional investigation, but the investigation was never resolved. No response was either received or documented prior to the section 366.26 hearing in October 2024. While the court did not have definitive information that Dakota was affiliated with federally recognized tribes, it was aware the investigation of a claim of Dakota ancestry was pending, with no follow up over the course of five months.

Again, we recognize respondent's concerns about evidence outside the record being used to reverse an order on appeal, but in this particular case, the website was accessed and cited by the department in their search and merely buttresses mother's claim that the investigation into the claim of Dakota ancestry was insufficient. As such, we conclude the court's finding the department conducted an adequate inquiry was an abuse of discretion, and conditional reversal of the order terminating parental rights and remand for compliance with the statutory inquiry requirements is required. (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1151.)

We do want to note the department was very thorough and diligent in contacting family members and gathering pertinent information, and for the most part followed up appropriately on family members' claims of ancestry. Under the circumstances of this case, however, we must remand for the department to complete their duty of further inquiry as to the paternal grandfather's claim of Dakota ancestry.

## **DISPOSITION**

The order terminating parental rights is conditionally reversed. The matter is remanded to the juvenile court for compliance with the inquiry and notice requirements of sections 224.2 and 224.3 and the documentation provisions of California Rules of Court, rule 5.481(a)(5). If the juvenile court thereafter finds a proper and adequate further inquiry and due diligence has been conducted and concludes ICWA does not apply (§ 224.2, subd. (i)(2)), then the court shall reinstate the order terminating parental rights. If the juvenile court concludes ICWA applies, then it shall proceed in conformity with ICWA and California implementing provisions. (See 25 U.S.C., § 1912, subd. (a); §§ 224.2, subd. (i)(1), 224.3, 224.4.)


DE SANTOS, J.

WE CONCUR:


LEVY, Acting P. J.


MEEHAN, J.

21.